## ELDRIDGE *v.* TREZEVANT.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF LOUISIANA.

No. 62. Submitted October 17, 1895. — Decided January 6, 1896.

In Louisiana the constitution and laws of the State, as interpreted by its highest court, permit the taking, without compensation, of land for the construction of a public levee on the Mississippi River, on the ground that the State has, under French laws existing before its transfer to the United States, a servitude on such lands for such a purpose; and they subject a citizen of another State owning such land therein, the title to which was derived from the United States, to the operation of the state law as so interpreted. *Held*, that there was no error in this so long as the citizen of another State receives the same measure of right as that awarded to citizens of Louisiana in regard to their property similarly situated.

The provisions of the Fourteenth Amendment to the Constitution do not override public rights, existing in the form of servitudes or easements, which are held by the courts of a State to be valid under its Constitution and laws.

WILLIAM B. Eldridge, a citizen of the State of Mississippi, filed in the Circuit Court of the United States for the Western District of Louisiana a bill of complaint against Henry B. Richardson, Chief of the Board of Engineers of the State of Louisiana, and Peter J. Trezevant, citizens of Louisiana, whereby he sought to have the defendants enjoined from the construction of a certain public levee through a plantation belonging to the complainant, and situated in Carroll township, State of Louisiana.

An answer was filed admitting that the State Board of Engineers had projected and laid out a public levee through the complainant's plantation, and that a contract to construct said levee had been awarded to Peter J. Trezevant, but claiming that such proceedings were in pursuance of an act of the general assembly of the State of Louisiana, approved February 14, 1879, and were therefore lawful.

The case was heard upon the issues presented by the bill and answer, supplemented with an admission that none of the

acts complained of in the bill were wanton, malicious, or arbitrary.

On June 20, 1891, a decree was rendered adjudging the sufficiency of the answer and dismissing the bill, from which decree an appeal was taken to this court.

*Mr. Wade R. Young* for appellant.

Article 156 of the constitution of Louisiana, adopted July 23, 1879, provides that private property shall not be taken nor damaged for public purposes without just and adequate compensation being first paid.

In construing this prohibition in *Ruch* v. *New Orleans*, 43 La. Ann. 275, the state Supreme Court said that the city was authorized to take the plaintiff's property, to the extent the same might be required for public use, in the enlargement of the public roadway immediately in front of it, in virtue of the right of appropriation vested in it by the police power of the State. The right of appropriation, which is recognized in the code, was held to be coexistent with the right of expropriation, as provided for in Rev. Civil Code. All of those provisions preëxisted in the constitution, with the 155th and 156th articles of which the right of appropriation is said to conflict. This, of itself, the court said, leads to the supposition of their entire compatibility. But the two principles are of well recognized and ancient origin, — one being an exercise of the police power, any loss sustained thereby entitling the injured party to no recompense, the same being *damnum absque injuria;* the other being the exercise of the right of eminent domain, the damages entailed being compensable. *Bass* v. *State*, 34 La. Ann. 494; *Chaffe* v. *Trezevant*, 38 La. Ann. 746.

In ordinary cases this interpretation would be binding on this court, but in determining whether the laws of a State are in conflict with the prohibitions of the Federal Constitution, this court must decide for itself, and if the decision requires a construction of state constitutions and laws, it is not necessarily governed by previous decisions of the state courts. *Vicksburg &c. Railroad* v. *Dennis*, 116 U. S. 665.

The prohibition against the taking of private property for public use is to be found in the Federal Constitution, and in the constitutions of most, if not all of the States, and has received a uniform interpretation, which has become a part of the jurisprudence of the country.

It was alluded to by this court in *Pumpelly* v. *Green Bay Company*, 13 Wall. 166, as a provision of constitutional law always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen, and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, and this court quoted the language of Dayton, J., in *Sinnickson* v. *Johnson*, 2 Harrison, (5 N. J. Law,) 129, "that this power to take private property reaches back of all constitutional provisions; and it seems to have been a settled principle of universal law that the right to compensation is an incident to the exercise of that power; that the one is inseparably connected with the other; that they may be said to exist, not as separate and distinct principles, but as part of one and the same principle."

The state court seems to have appreciated this difficulty, and to have disposed of it by giving the thing another name, and justifying the taking as an exercise of the police power, entirely compatible with the right of expropriation, and provided by the statute for the making and repairing of levees, roads, and other public or common works.

It becomes necessary, then, to inquire into the origin and history of the servitude. The article was taken from articles 649, 650, of the Code Napoleon: "Servitudes established by law have for object the public or communal utility, or the utility of private persons. Those established for the public or communal utility have for object the towpaths along the navigable or floatable rivers, the construction or repairing of roads and other public or communal works. All that concerns this kind of servitude is determined by laws or particular regulations."

The laws which formerly regulated this servitude have been

long repealed, as the necessity therefor ceased to exist, and nothing remains of the legislation except the principle embodied in the article of the Code. But the principle of indemnity for damage so inflicted was early recognized by legislation, which, though local in its character, was a legislative recognition of the right to full compensation, and an abandonment of the principle of servitude, and received the support of the courts. *Zenor* v. *Concordia. Parish*, 7 La. Ann. 150; *Dubose* v. *Levee Commissioners*, 11 La. Ann. 165; *Mithoff* v. *Carrollton*, 12 La. Ann. 185 ; *Inge* v. *Police Jury*, 14 La. Ann. 117.

After the war the former laws were repealed, and a new and different system adopted, by which the State undertook the duty of making and repairing levees. *Police Jury* v. *Tardos*, 22 La. Ann. 58; *Surgi* v. *Matthews*, 24 La. Ann. 613. The constitution of 1868, article 110, contained the same provision that " vested rights should not be divested, unless for purposes of public utility and for adequate compensation made."

The case of *Bass* v. *State*, 34 La. Ann. 494, arose and was decided under that constitution, and the court held that private property could be taken for public use, in the exercise of the general police powers of the State, without making compensation therefor. In 1879 the people adopted a new constitution, and in that appears for the first time the provision in the words of the Fifth Amendment to the Constitution of the United States, and of so many of the States, that " private property shall not be taken for public purposes without just compensation."

This provision had at that time been construed by this court and by the courts of many of the States, and it had come to be understood that the exercise of the police power, as distinguished from the right of eminent domain, was a matter of public law, rather than a matter of legislative or judicial discretion. The constitution of Mississippi contained the provision that private property shall not be taken for public use without just compensation being first made. In the case of *Penrice* v. *Wallis*, 37 Mississippi, 172, the same argument was

used, that the Levee Commissioners could take private prop-
erty for the purpose of making public levees, without compen-
sation. The court said: "In cases of public emergencies,
such as the calamities of fire, flood, war, pestilence, and famine,
private property may be taken and applied to public use
without just compensation being made therefor, upon the
principle of imperative necessity for the public protection; but
in order to justify such appropriation, the necessity must be
apparently present, and the apprehended danger must be so
imminent and impending, as not to admit of the delay
incident to legal proceedings for the condemnation of the
property."

The constitution of Wisconsin provided that "the property
of no person shall be taken for public use without just com-
pensation therefor." In construing this provision in *Pum-
pelly* v. *Green Bay Co.*, *supra*, this court said: "We are not
unaware of the numerous cases in the state courts in which
the doctrine has been successfully invoked, that for a conse-
quential injury to the property of the individual arising from
the prosecution of improvements of roads, streets, rivers, and
other highways for the public good, there is no redress; and
we do not deny that the principle is a sound one in its proper
application, to many injuries to property so originating. And
when, in the exercise of our duties here, we shall be called
upon to construe other state constitutions, we shall not be un-
mindful of the weight due to the decisions of the courts of
those States. But we are of opinion that the decisions re-
ferred to have gone to the uttermost limit of sound judicial
construction in favor of this principle, and, in some cases, be-
yond it, and that it remains true that where real estate is actu-
ally invaded by superinduced additions of water, earth, sand,
or other material, or by having any artificial structure placed
on it, so as to effectually destroy or impair its usefulness, it is
a taking, within the meaning of the Constitution, and that
this proposition is not in conflict with the weight of judicial
authority in this country, and certainly not without sound
principle."

It would naturally appear that the framers of the Louisiana

constitution of 1879, in adopting the provision in words which had received a settled construction, adopted the existing interpretation, rather than one founded on a principle of the Spanish and French laws, which had been in part abandoned for the parish of Concordia as early as 1829, and altogether abandoned for the parish of Tensas in 1848, and which is in conflict with the spirit of our institutions.

Moreover, although it is not directly at issue in this cause, the court can take judicial notice of the fact that the public levees of the State, on the shores of the Mississippi River, are now a part of a system of public works undertaken by the United States for the improvement of the navigation of the river, and incidentally in coöperation with the State, for the protection of the country from overflow, by confining the waters of the river, and that such levees, whether made by the United States or by the State, are parts of one and the same system, and are planned and executed for both purposes.

The judges of the United States Circuit Court, in *Hollingsworth* v. *Parish of Tensas*, 4 Woods, 280, considered that the exercise of the police powers of the State, and the right of eminent domain, were questions of general jurisprudence, and not of local law, and held that according to the principles of general jurisprudence, private property could not be taken or damaged for public use without compensation, either by authority of the police powers of the State, or under the right of eminent domain.

This opinion remained the law of the Federal court until the decree in this case, but the state court adhered to its doctrine that property can be taken, damaged, and destroyed without compensation, for the purpose of making and repairing public levees, in the exercise of the police power.

If any doubt could ever have existed that the distinction between the police power and the right of eminent domain is a question of general jurisprudence, and not of local law, such doubt has been solved by the prohibition of the Fourteenth Amendment, that no State shall deprive any person of property without due process of law. The words " due process of law," as used in the Federal constitution, do not mean the law and

jurisprudence of the State by which the wrong is worked. That construction would render the restriction absolutely nugatory, and turn this part of the constitution into mere nonsense. The people would say to the States, you shall not deprive any person of property without due process of law, but you shall be the judges of what is due process of law ; in other words, you shall not do the wrong unless you choose to do it. Due process of law in each particular case means such an exertion of the power of government as the settled maxims of law permit and sanction, and under such safeguards for the protection of individual rights as those maxims prescribe for the class of cases to which the one in question belongs.

It was in recognition of this principle that, in *Head* v. *Amoskeag Manufacturing Co.*, 113 U. S. 9, this court said that, by providing for an assessment of full compensation to the owners of lands flowed, it avoids the difficulty which arose in the case of *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166. Being a constitutional exercise of legislative power, and providing a suitable remedy, by trial in the regular course of justice, to recover compensation for the injury to the land of the plaintiff in error, it has not deprived him of his property without due process of law, in violation of the Fourteenth Amendment to the Constitution of the United States.

To determine under what circumstances property can be taken in the exercise of the police power, as distinguished from the right of eminent domain, this court does not look to the jurisprudence of the State, but to the settled maxims of law, always understood to have been adopted for protection and security to the rights of the individual as against the government. The maxim, " *Sic utere tuo ut alienum non lædas,*" is that which lies at the foundation of the power, and it is distinct from the right of eminent domain.

These police powers rest upon the maxim " *salus populi est suprema lex.*" This power to restrain a private injurious use of property is very different from the right of eminent domain. It is not taking private property from the owner, but a salutary restraint on the noxious use by the owner contrary to the maxim " *Sic utere tuo ut alienum non lædas.*"

The prohibition of the Fourteenth Amendment is directed to the States, and if the State, by its legislature, or by its courts, or other agency, can evade the prohibition by deciding for itself that such imperative necessity exists, and there is to be no appeal from its decision, the restriction would be rendered nugatory, and this part of the Constitution turned into mere nonsense.

Whether such imperative necessity exists as to justify the State in taking, damaging, and destroying private property for public purposes without compensation, in the exercise of the police power, is a question of Federal law, depending upon the facts of each case, which this court must determine for itself, and without regard to the decisions of the courts of the State.

It would be no answer to the complaint that the State was depriving a person of life, liberty, or property, to say that the State has decided that a condition of things exists to justify such violation of the prohibition, or has decided that it has not deprived the person of life, liberty, or property without due process of law.

As said by the court in *Penrice* v. *Wallis, ubi sup.*, the answer does not present such a plea. It does not pretend to set up such overwhelming necessity, in the face of the facts stated in the bill.

The only contention of the defendants, admitting all the facts stated in the bill, is that plaintiff holds his property subject to a servitude imposed by the laws of Louisiana, and that the construction of public levees is a matter within the police power of the State.

If such be the law of Louisiana, that the lands of plaintiff, being adjacent to the Mississippi River, are subject to a servitude or easement, in the exercise of which the State can take, damage, and destroy his property for the purpose of making and repairing levees, roads, and other public or common works, without compensation, such a law is repugnant to and in conflict with the prohibition of the Fourteenth Amendment of the Constitution of the United States, unless it be pleaded and shown that there exists such imperative necessity as to justify the exercise of the police power of the State.

The restriction imposed by the Federal constitution upon the power of the State to deprive persons of life, liberty, or property, cannot be subordinated to the customs of France and of Spain, embodied in the statute laws of the State, nor can the Constitution of the United States be so interpreted that the State can decide for itself in each case what constitutes depriving a person of life, liberty, or property without due process of law, and such decision be binding on the courts of the United States.

Unless the statutes relied on by defendants provide a suitable remedy, by trial in the regular course of justice, to recover compensation for the injury, they are null and void, and the defendants were made trespassers, without warrant or authority of law.

If, on the other hand, the general provision, embodied in article 156 of the state constitution, and in article 497 of the civil code, provide a suitable remedy, by trial in the regular course of justice, to recover compensation for the injury to plaintiff's property, the compensation should have been first paid, and the defendants were proceeding to take, damage, and destroy the property of the plaintiff, in violation of the constitution and laws of the State.

In either case the plaintiff had a plain right to the equitable remedy by injunction, and the more so, because he would have had no remedy at all against the State, for the torts of its officers and agents.

The District Judge, with too much regard for the public interest, and too little regard for private right, allowed the defendants to proceed to construct the levee, by an *ex parte* order, upon their furnishing bond and security in the sum of only four thousand dollars.

This was manifest error, as just and equitable compensation had not been first made, and the plaintiff is left without a remedy, except by an action at law on the bond, and a personal action against the defendants for the balance.

It is therefore respectfully submitted that the judgment appealed from should be reversed, and the injunction reinstated, and the right of plaintiff to recover his compensation

for the injury by an action on the bond, and by a personal action against the defendants, be recognized and reserved, and the cause remanded for further proceedings.

*Mr. M. J. Cunningham,* Attorney General of the State of Louisiana, and *Mr. T. M. Miller* for appellees.

MR. JUSTICE SHIRAS, after stating the case, delivered the opinion of the court.

By an act of the general assembly of the State of Louisiana, approved February 14, 1879, there was created a board of state engineers, whose duty it was to make a survey of the watercourses, public works, and levees of the State. They were to report to the governor of the State the improvements which they should deem necessary, and the construction of such levees as were of prime importance to the State at large and were beyond the means of the parochial authorities. They were also, in said report, to furnish estimates and specifications of work necessary to be done. It was thereupon made the duty of the governor to advertise for proposals to make such improvements and construct such levees as were recommended, and to award the contracts to the lowest responsible bidder, under proper and sufficient bonds for the faithful performance of their contracts; and upon completion of said works it was made the duty of the board of engineers to examine and measure the work and to certify to its correctness; and, upon approval by the governor, the auditor of public accounts of the State was to draw his warrant therefor, payable out of the general engineer fund, or such fund as should be provided by law.

In the exercise of the powers thus conferred, the board of engineers reported to the governor that it was necessary to construct a levee across complainant's plantation; that such levee was of prime importance to the State at large; would have to be of large size; that the river front was a dangerous and constantly caving bank, and that necessarily the levee had to be located some distance from the river; and they

furnished estimates and specifications of the work necessary to be.done.  Subsequently, after advertising for proposals, the governor awarded the contract for constructing the levees proposed to the defendant, Peter J. Trezevant, as the lowest responsible bidder, who was, at the time of filing of the bill, proceeding with the work.

The plaintiff expressly admits, in his bill, that, although the constitution of the State of Louisiana contains a provision that private property shall not be taken or damaged without adequate and just compensation being first paid, the. laws of the State, as interpreted by the Supreme Court of the State, provide no remedy for cases of proceedings under the levee laws, and that the Supreme Court of the State has decided that such taking, damage, and destruction of property for the purpose of building a public levee is an exercise of the police power of the State, and *damnum absque injuria* because the State has a right of servitude or easement over the lands on the shores of navigable rivers for the making and repairing of levees, roads, and other public works.  But he contends that, as he cannot sue the State for compensation, and as an action at law, if such would lie, would not furnish that just and adequate compensation first- paid, contemplated by the provision of the state constitution, he has a right, as a citizen of another State, to invoke, in the Circuit Court of the United States, the protection of the Fourteenth Amendment of the Constitution of the United States, which provides that no State shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of its laws.

The concession distinctly made by the complainant, in his bill, that the state courts refuse to recognize that owners of lands abutting on the Mississippi River and the bayous running to and from the same, where levees are necessary to confine the waters and to protect the inhabitants against inundation, are entitled, when a public levee is located upon such lands, to invoke the application of that provision of the state constitution which provides that " private property shall not be taken nor damaged for public use without just and adequate com-

pensation first paid," and repeated in the brief filed on his behalf in this court, relieves us from an extended examination of the origin and history of the state enactments, constitutional and legislative, and of the decisions of the state courts on this subject.

It is important, however, to observe the ground upon which the state legislative and judicial authorities base their action. That ground is found in the doctrine existing in the Territory of Louisiana before its purchase by the United States and continuing to this time, that lands abutting on the rivers and bayous are subject to a servitude in favor of the public, whereby such portions thereof as are necessary for the purpose of making and repairing public levees may be taken, in pursuance of law, without compensation. This doctrine is said to have been derived from the Code Napoleon, whose 649th and 650th articles were as follows:

"Servitudes established by law have for object the public or communal utility, or the utility of private persons. Those established for the public or communal utility have for object the towpaths along the navigable or floatable rivers, the construction or repairing of roads and other public or communal works. All that concerns this kind of servitude is determined by laws or particular regulations."

But whether the servitude in question was derived from French or Spanish sources, or from local and natural causes, we need not inquire, because it is explicitly asserted in the Civil Code of Louisiana, article 661, in the following terms:

"Servitudes imposed for the public or common utility relate to the space which is to be left for public use by the adjacent proprietors, on the shores of navigable rivers, and for the making and repairing of levees, roads, and other public or common

---

[1] 649 — Les servitudes établies par la loi ont pour objet l'utilité publique ou communale, ou l'utilité des particuliers.

650 — Celles établies pour l'utilité publique ou communale ont pour objet le marchepied le long des rivières navigables ou flottables, la construction ou réparation des chemins et autres ouvrages publics ou communaux.

Tout ce qui concerne cette espèce de servitude, est déterminé par des lois ou des règlements particuliers.

works. All that relates to this kind of servitude is determined by laws or particular regulations."

In the case of *Zenor* v. *Parish of Concordia*, 7 La. Ann. 150, where the legislature had enacted that the police jury of a parish exposed to inundation should have plenary power to locate and construct levees, and where such police jury, in pursuance of these powers, had placed and built a levee on the lands of the complainant, greatly to his detriment, it was held that the enactment was valid, and that no liability for damages was caused by a *bona fide* proceeding under it. The court said:

" In this State, so much exposed to ruinous inundations, the public have the undoubted right, on the shores of the Mississippi River, to the use of the space of ground necessary for the making and repairing of the public levees and roads. C. C. Art. 661. It was the condition of the ancient grants of land on the Mississippi River, and sufficient depth was always given to each tract, to prevent the exercise of the public rights from proving ruinous to the individual.

" Speculation and other motives have, in later times, caused the division and sale of some tracts, and entries of others, with large fronts and little depth, in opposition to the general policy of the country. Thus, in the present case, the plaintiff has scarcely any depth, with a large front, in a deep bend, with a caving bank. The policy of the country and the laws of the land, made for the general safety, cannot yield to cases of individual hardship. Those who purchase and own the front on the Mississippi River gain all that is made by alluvion, and lose all that is carried away by abrasion. And those who choose to purchase tracks with little depth, in caving bends, expose themselves, knowingly, to total loss, and must suffer the consequences when they occur. They suffer *damnum absque injuria*."

In *Dubose* v. *Levee Commissioners*, 11 La. Ann. 165, the plaintiff sued for damages occasioned to his land by the acts of the commissioners in changing the line of the public levee, but the court, citing the provisions of the code, article 661, held that " the law concerning the expropriation of private property for public use does not apply to such lands upon the

banks of navigable rivers as may be found necessary for levee purposes. The quantity of land to be taken for such purposes presents a question of policy or administration to be decided by the local authorities, whose decisions should not be revised by this tribunal, except for the most cogent reasons, and where there has been manifest oppression or injustice."

In the case of *Bass* v. *State of Louisiana*, 34 La. Ann. 494, the Supreme Court again held that an owner of land abutting on the Mississippi River could not recover for damages inflicted upon his property by the State Board of Engineers and contractors in locating and constructing a public levee, but put the immunity of the State mainly upon the proposition that such public works are done in the exercise of the police power, and did not advert to the doctrine of servitude, upon which the previous decision had placed such immunity.

But we do not understand that the Supreme Court of the State intended thereby to repudiate the doctrine of a servitude, explicitly declared in the code, and recognized, through a long period, by many decisions. If, to approve the judgment in that case, it were necessary to hold that the State and its agents can take private property, wherever situated, and apply it to any public purpose, and escape from the duty of compensation by terming such action an exercise of the police power, it is difficult to see how such a conclusion could be reached by the courts of a State in whose constitution is to be found a provision that private property shall not be taken for public use without just and adequate compensation first made. But, as we have said, it is not necessary to so read the decision in question, nor to consider whether, even in such a case, a remedy could be found in any provision of the Federal Constitution.

This, we think, clearly appears by the later case of *Ruch* v. *New Orleans*, 43 La. Ann. 275, where the Supreme Court reviewed the law and the cases, and again put the immunity of the city from liability for damages occasioned to the front of the plaintiff's property by a public work upon the long established doctrine of a servitude, and declared that "the riparian owner enjoys his property *sub modo*, *i.e.* subject to

the right of the public to reserve space enough for levees, public works, and the like; that over this space the front proprietor never acquires complete dominion. It never passes free of this reservation to a purchaser."

With the admission that, under the state constitution and laws, as construed by the highest court of the State, the plaintiff below was not entitled to the remedies he sought, we are requested to hold that he can obtain relief by invoking, in a Circuit Court of the United States, the protection of the Fourteenth Amendment of the Constitution of the United States, which declares that no State shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

The first contention of the plaintiff in error is that, as it is admitted that he owns the land in fee through title derived by patent from the United States, without reservation, whatever may have been the conditions of the ancient grants, no such condition attaches to his ownership, and the lands, although bordering on a navigable stream, are as much within the protection of the constitutional principle awarding compensation as other property. In other words, the claim is that the servitude, under which are held lands whose titles are derived by grant from Spain or France, or from the State, does not attach to lands whose titles are derived from the United States.

Previous decisions of this court furnish a ready answer to this contention.

In *Barney* v. *Keokuk,* 94 U. S. 324, 337, where the dispute was as to the nature of the title to the river front and as to new ground formed by filling in upon the bed of the river, and where some conflict was shown to exist between the common law rules as to such ownership and those asserted by the State of Iowa in her legislation and the decisions of her courts, Mr. Justice Bradley, speaking for the court, said:

"It is generally conceded that the riparian title attaches to subsequent accretions to the land affected by the gradual and imperceptible operation of natural causes. But whether it attaches to land reclaimed by artificial means from the bed of the river, or to sudden accretions produced by unusual

floods, *is a question which each State decides for itself.* . . . The confusion of navigable with tide water, found in the monuments of the common law, long prevailed in this country, notwithstanding the broad differences existing between the extent and topography of the British island and that of the American continent. It had the influence for two generations of excluding the admiralty jurisdiction from our great rivers and inland seas; and, under the like influence, it laid the foundation in many States of doctrines with regard to the ownership of the soil in navigable waters above tide water at variance with sound principles of public policy. Whether, as rules of property, it would now be safe to change these doctrines where they have been applied, as before remarked, *is for the several States themselves to determine.* If they choose to resign to the riparian proprietor rights which properly belong to them in the sovereign capacity, it is not for others to raise objections."

In *Packer* v. *Bird*, 137 U. S. 661, 669, where a similar question arose, and where it was claimed that the fact that the title was derived by a grant from the United States afforded a reason for decision, Mr. Justice Field stated the question as follows :

" The courts of the United States will construe the grants of the general government without reference to the rules of construction adopted by the States for their grants; but whatever incidents of rights attach to the ownership of property conveyed by the government will be determined by the States, subject to the condition that their rules do not impair the efficacy of the grants or the use and enjoyment of the property by the grantee. As an incident of such ownership the right of the riparian owner, where the waters are above the influence of the tide, will be limited according to the law of the State, either to low or high water mark, or will extend to the middle of the stream."

The language of *Barney* v. *Keokuk* was cited with approval, and the conclusion reached was that the law of the State, as construed by its Supreme Court, was decisive of the controversy.

The question was again presented in *Hardin* v. *Jordan*, 140 U. S. 372, 384, and, after a review of the cases, Mr. Justice Bradley stated the conclusion as follows :

" We do not think it necessary to discuss this point further. In our judgment, the grants of the government for lands bounded on streams and other waters, without any reservation or restriction of terms, are to be construed as to their effect according to the law of the State in which the lands lie."

In *Shively* v. *Bowlby*, 152 U. S. 1, 58, this court had to deal with a conflict as to the title in certain lands below high water mark in the Columbia River in the State of Oregon, between parties claiming respectively under the United States and under the State of Oregon. The entire subject was thoroughly examined, involving a review of all the cases, both state and Federal, and one of the conclusions reached was thus stated by Mr. Justice Gray :

" Grants by Congress of portions of the public lands within a territory to settlers thereon, though bordering on or bounded by navigable waters, convey, of their own force, no title or right below high water mark, and do not impair the title and dominion of the future State when created ; but leave the question of the use of the shores by the owners of uplands to the sovereign control of each State, subject only to the rights vested by the Constitution of the United States."

These decisions not only dispose of the proposition that lands, situated within a State, but whose title is derived from the United States, are entitled to be exempted from local regulations admitted to be applicable to lands held by grant from the State, but also of the other proposition that the provisions of the Fourteenth Amendment extend to and override public rights, existing in the form of servitudes or easements, held by the courts of a State to be valid under the constitution and laws of such State.

The subject-matter of such rights and regulations falls within the control of the States, and the provisions of the Fourteenth Amendment of the Constitution of the United States are satisfied if, in cases like the present one, the state law, with its benefits and its obligations, is impartially adminis-

tered. *Walker* v. *Sauvinet,* 92 U. S. 90 ; *Davidson* v. *New Orleans,* 96. U. S. 97 ; *Missouri* v. *Lewis,* 101 U. S. 22 · *Hallinger* v. *Davis,* 146 U. S. 314.

The plaintiff in error is, indeed, not a citizen of Louisiana, but he concedes that, as respects his property in that State, he has received the same measure of right as that awarded to its citizens, and we are unable to see, in the light of the Federal Constitution, that he has been deprived of his property without due process of law, or been denied the equal protection of the laws.

The decree of the court below is.

*Affirmed.*

Mr. Justice Brewer dissented.