**UNITED STATES of America,**
**Appellant and Appellee,**

v.

**GENERAL BOX COMPANY,**
**Appellee and Appellant.**

**GENERAL BOX COMPANY,**
**Appellee and Appellant,**

v.

**UNITED STATES of America,**
**Appellant and Appellee.**

**No. 15329.**

United States Court of Appeals
Fifth Circuit.

June 17, 1955.

Rehearing Denied Aug. 5, 1955.

---

Cameron, Circuit Judge, dissented.

S. Billingsley Hill, Atty. Department of Justice, John F. Cotter, Washington, D. C., Perry W. Morton, Asst. Atty. Gen., T. Fitzhugh Wilson, U. S. Atty., Shreveport, La., Roger P. Marquis, Atty., Department of Justice, Washington, D. C., for appellant.

Fred G. Benton, Baton Rouge, La., Carl A. Chadwick, Natchez, Miss., P. Z. Jones, Jackson, Miss., Thompson L. Clarke, St. Joseph, La., Barnett, Jones & Montgomery, Jackson, Miss., for appellee.

Before HUTCHESON, Chief Judge, and TUTTLE and CAMERON, Circuit Judges.

HUTCHESON, Chief Judge.

Suing under Sections 1346 and 1402, 28 U.S.C., for the claimed wrongful destruction by the United States, its agents and servants of timber on two tracts of land, appellee, plaintiff below, brought two separate suits against the United States to recover the damages resulting therefrom. Consolidated by stipulation and order and tried as one suit, there was a judgment for plaintiffs against the United States for $10,801. with interest at four percent from its entry. From that judgment the United States prose-

cutes an appeal seeking a reversal and rendition, while plaintiff-appellee appeals from so much of it as allows interest not from the injury but from the judgment and fixes it at four instead of five percent.

On its appeal, the United States, specifying many errors, presents four questions [1] for our decision.

Since an affirmative answer to the first two questions will require a reversal of the judgment and will render unnecessary an answer to the last two, and since, for the reasons hereafter stated, we are of the clear opinion that an affirmative answer is required, we will not, in reaching the conclusion that the district judge was in error in his view of the case and the actions he took in it, undertake to decide or discuss the last two questions.

Mindful, as we are, of the thorough consideration the district judge gave to the case, as evidenced by his several opinions in it,[2] and of his unusual opportunities, as an outstanding and greatly influential member of the Louisiana Constitutional Convention of 1921, and of the Supreme Court of Louisiana, to know and understand the constitution and laws of his native state, we yet find ourselves unable to agree with his conclusions as to the legal effect of the undisputed facts [3]

1. These are: (1) Whether a Louisiana Levee Board correctly exercised a servitude for a right of way to enlarge a levee along the Mississippi River and donated it to the United States so that compensation, if any, for standing timber destroyed on the right of way is determined by Louisiana law relative to such a servitude.

(2) Whether under the Louisiana Constitution the timber could be destroyed without compensation to the appellee because (a) the land on which it stood is batture as to which compensation is forbidden, (b) standing timber is not a compensable property when destroyed for levee purposes, or (c) there was no allegation or showing of the assessed value of the timber which is the limit of compensation for property taken or destroyed.

(3) Whether the United States, rather than the Levee Board took the right of way and, if so, whether the compensation may exceed that allowed by state law.

(4) Whether the Levee Board is bound by state and federal law to pay the compensation awarded.

2. 94 F.Supp. 441; 107 F.Supp. 981; 119 F.Supp. 749.

3. The timber destroyed by tractors of the United States in the enlargement of an existing levee on the main stem of the Mississippi River in Louisiana was on land lying between the old levee and the river. The project was undertaken pursuant to the provisions of the Federal Flood Control Act of May 15, 1928, 45 Stat. 535, as amended 33 U.S.C.A. § 702a et seq., which provides that the state shall provide without cost to the United States all rights of way for levee foundations and levees on the main stem of the Mississippi River. By Art. 16, § 5 of the 1921 Louisiana Constitution, LSA, Boards of Commission of Levee Districts are authorized to cooperate with the government in the construction of such levees and by resolution in 1928 and 1929, the Board of Commissioners of the 5th Louisiana Levee District, the board involved here agreed to provide without cost to the United States all rights of way.

By correspondence commencing May 19, 1947, the district engineer advised the levee board of the proposed enlargement of the levee, submitted the plans and requested a formal statement in the form of a letter signed by the president of the board, that the rights of way were available.

On June 12, 1947, the president of the board acknowledged receipt of the letter and advised the engineer that rights of way were available and the minutes of the board on July 9, 1947, contain an entry that the request of the corps of engineers was complied with by a letter dated June 12, 1947, read to it by the president of the board.

Since Art. 16, § 6 of the 1921 Louisiana Constitution authorizes payment not to exceed the assessed value in the preceding year for land and improvements taken, the secretary of the board wrote to the parish assessor for a list of the property owners within the area. By letter of July 31, 1947, the list was furnished but it did not include the appellee. The owners of the fee in the two tracts were on the assessment list and were notified, but the appellee was not, and did not learn of the work until after the destruction of his timber had begun.

and constrained to hold the law of the case to be contrary to his opinion of it. On the basis of these facts, the United States defended the suit upon several propositions of law, with which we find ourselves in substantial accord.

The first and most important of these is thus stated and argued by it. *The United States is not liable because it received the right of way from the levee board which correctly appropriated it without compensation under a riparian servitude,* because:

■ The property is subject to a riparian servitude for levee purposes, and, under the civil law of Louisiana from ancient times, the owner of property bordering upon a navigable stream has been required to give without compensation so much of it as might be needed for the construction of levees and highways.[4]

■ While the right to the completely free use of the servitude was changed to some extent by Section 6 of Article 16 of the Louisiana Constitution of 1921, which provides "Lands and improvements thereon hereafter actually used or destroyed for levees or levee drainage purposes * * * shall be paid for at a price not to exceed the assessed value of the preceding year; provided, that this shall not apply to batture * * *." As was pointed out in Mayer v. Board of Commissioners, 177 La. 1119, 150 So. 295, whatever the section may give to owners of land is in the nature of a gratuity, and contrary to the conclusion of the district judge, the servitude was correctly exercised by the levee board for itself and for the United States.

■ The district court mistakenly assumed that the State of Louisiana or its agencies must accord notice and a hearing to exercise the right which it has to appropriate and use a property interest which it owns in the use of the lands for levees, and, on that mistaken assumption, incorrectly held that the property was not effectively appropriated. This was a mistaken view, because the property here was not property taken from another by expropriation but was a public use of a public right already owned and the procedure required for an expropriation of private property was therefore not necessary to the exercise of the servitude already existing.[5] In Danziger v. United States, D.C., 93 F.Supp. 70, 72, the court said, "There is no formal procedure which levee districts must follow in appropriating property", while in Dickson v. Board of Commissioners, 210 La. 121, 26 So.2d 474, it was held that the state has the undoubted right and authority to appropriate such land to a use to which it is subject under its very title. No notice, therefore, was necessary in an appropriation of a right of way for a levee. Board of Commissioners of Red River, Atchafalaya and Bayou Boeuf Levee Dist. v. Trouille, 212 La. 152, 31 So.2d 700. Moreover notice was given to all persons shown by the tax assessor's rolls to be the owners, and under the settled jurisprudence of Louisiana, no compensation is owed for exercise of this servitude, (1) if the land in question is batture,

The destruction was by private contractors employed by the United States under a contract which authorized bulldozing or pushing the trees over and out of the area. It was necessary to remove the trees in order to obtain the type of soil necessary for enlarging the levee. When the contractors were asked by the appellee to discontinue and allow it to cut the remaining timber, the request was refused because the contractors' bid had been made on the basis of bulldozing the standing timber, a less expensive method than removing the stumps after the timber had been cut. The contractors did, however, cooperate with the timber owners to such an extent that a considerable part of the value of the timber was salvaged by them.

4. Hart v. Board of Levee Com'rs, C.C., 54 F. 559; Peart v. Meeker, 45 La. Ann. 421, 12 So. 490; Board of Com'rs of Tensas Basin Levee Dist. v. Franklin, La., 54 So.2d 125; Eldridge v. Trezevant, 160 U.S. 452, 16 S.Ct. 345, 40 L.Ed. 490; Wolfe v. Hurley, D.C., 46 F. 2d 515, affirmed 283 U.S. 801, 51 S.Ct. 493, 75 L.Ed. 1423; Pruyn v. Nelson Bros., 180 La. 760, 157 So. 585.

5. Authorities cited in note 4, supra.

for Art. 16, § 6 forbids payment for batture used or destroyed for levees, and (2) if it is not batture, the same article restricts compensation to properties which had been assessed.

The district court acknowledged that there existed a question of whether this was batture but did not decide it. However, this is the standard definition of batture, "The batture is that part of the river bed which is uncovered at the time of low water, but is covered annually at the time of ordinary high water; when it ceases to be covered at the time of ordinary high water, it ceases to be batture and becomes bank of the river." Boyce Cottonseed Oil Mfg. Co. v. Board of Commissioners, 160 La. 727, 107 So. 506, 508; Ward v. Board of Levee Com'rs, 152 La. 158, 92 So. 769; 21 Tulane Law Review, 660–661; Art. 457 of the Louisiana Civil Code provides that "on the borders of the Mississippi and other navigable streams, where there are levees, established according to law, the levees shall form the banks", and the undisputed facts show the land on which the timber stood to be batture. The property claimed by the appellee to have been damaged and destroyed was growing on land between the main line levee being enlarged and the river itself, and the evidence is uncontradicted that the entire property was overflowed annually or nearly so.

If, however, the land was not batture, Art. 16, § 6 of the Louisiana Constitution limits recovery for lands and improvements thereon other than batture to a price not to exceed the assessed value for the preceding year. The appellee did not allege or show that either the lands on which the timber stood or the timber itself was assessed for the preceding year and the courts of Louisiana have uniformly held that it is necessary for the plaintiff in a suit for compensation for property used or destroyed for levee purposes to allege that the property was assessed for taxes in the preceding year and to allege that the amount of the assessment was, for that is all that the plaintiff could have a right of action for.

Dickson v. Board of Com'rs, 210 La. 121, 26 So.2d 474, and cases cited.

Whatever, then, if the matter were of first impression, might be thought of the correctness of such a view against a view that *the Constitution did not mean to provide that the assessment of the property was essential to the constitutional grant of compensation* but merely intended to set up a measure of the value of the property which could be satisfied, if the property was not assessed, by showing the amount for which other similar property was assessed, the law of Louisiana has been differently and positively declared by its courts, and we are bound by that declaration.

The fact that appellee's timber was owned separately from the land is not, and cannot be, a controlling factor under the law as it was in Louisiana prior to the Constitution or as the Louisiana courts now construe it to be under the amendment.

Finally, the United States urges upon us, and we agree, that *it is not liable under any provision of state or federal law*. It is not liable under state law because state law does not apply to it. It is not liable under federal law because, taking in right of the state of Louisiana, it succeeds to the rights of the state, and if, as we have seen, no compensation was due from the state, none is due from the United States, which acts in the place of and for the state. Danziger v. United States, D.C., 93 F.Supp. 70; Pruyn v. Nelson Bros., 180 La. 760, 157 So. 585; Wolfe v. Hurley, D.C., 46 F.2d 515; United States ex rel. and for Use of Tennessee Valley Authority v. Powelson, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390.

Further, there is no basis in fact or in law for the claim of the plaintiff that the United States, through its contractors, tortiously destroyed the timber. Plaintiff has expressly disclaimed suing under the federal tort claims act. It based and bases its claim upon an implied contract to recover for the timber taken and since as we have held, the tim-

ber had been already taken by the levee board under its right of appropriation, the United States could not be said to have taken it from the plaintiff under an implied promise to pay for it, and plaintiff's claim on this score must fail too.

We are of the clear opinion that the district judge was wrong in giving judgment against the United States and that the judgment must be reversed and here rendered for it.

Reversed and rendered.

CAMERON, Circuit Judge (dissenting).

The result attending the reversal of this judgment [1] under the majority opinion is a harsh result. Appellee, General Box Company, owned the record title to the timber on two tracts of land. The timber was valuable, and the Box Company had paid a large sum of money for it. Without warning it was confronted, September 12, 1947, by a number of bulldozers which were engaged in the systematic destruction of portions of that timber. At that time the timber on one of the plantations had been destroyed, and the timber on the second plantation was in process of destruction. The contractors refused to cease the destruction of the remainder and permit appellee to go ahead of the bulldozers and remove its timber because their contract gave them the right to remove and destroy the timber. The United States benefitted financially by such destruction of appellee's property.[2] Appellee has never been paid any money for the property so taken by those acting for the United States, and the majority opinion denies it any recovery at all.

Such a result, a court would like to avoid—indeed, would refuse to reach unless inescapably impelled to it by the inexorable requirements of the law as applied to the facts before it. These facts and that law do not, in my opinion, require the reaching of so inequitable a result. The question before the court is this:

Can the United States Government, without just compensation, confiscate and destroy for its own monetary gain, the valuable timber of appellee growing on lands of others, basing its right so to do on the claim that the lands are bature; when state authorities have taken no official action and made no minute entry towards exercising the servitude against the lands or the timber, and have taken no steps at all to that end beyond giving written notice to the land owners (but not to appellee) four months after the confiscation had begun and one month after the destruction of appellee's timber had been completed?

The majority finds itself impaled upon what it conceives to be the stern provisions of the Constitution and statutes of the State of Louisiana as construed by its courts, and feels bound by them to re-

1. Appellee, General Box Company, filed two civil actions, one on Nov. 30, 1948 and one on Oct. 19, 1949, but the two were consolidated for trial and have been dealt with throughout as if they constitute one action, and this opinion will refer to them as if they were one civil action.

2. The government's brief thus explains this feature: "The appellee was not notified and did not learn of the work until after the destruction of its timber had begun. * * * The destruction was by private contractors employed by the United States. When the contractors were asked by the appellee to discontinue and allow it to cut the timber which remained, the request was refused because the contractors' bid had been made on the basis of bulldozing the standing timber. This was a substantially less expensive method than removing the stumps which appellee's salvaging operations would leave. The contract with the United States authorized pushing the trees over and out of the area. It was necessary to remove the trees in order to obtain the type of soil necessary for enlarging the levee. * * * It was pushed over, and thus destroyed, by bulldozers because the contractors' bid was substantially reduced 'on the basis of that method of removing the timber'. The destruction was, therefore, not unreasonable because * * * 'the Government, just as anyone else, is not required to proceed oblivious to elements of cost'."

verse the findings of the court below. I do not feel so bound, partly because I think the majority has misconceived the effect of those decisions; but have the definite idea that we should affirm the holdings of the court below as set forth in the opinions written and published by the district judge.

As pointed out in the majority opinion, the district judge who tried this case below was possessed of unusual qualifications to interpret Louisiana law. His many years of service on the Supreme Court of Louisiana and later as United States District Judge give him those qualifications.[3] He also points out [4] that he was the author of the Louisiana constitutional provisions which lie at the base of the inequity the majority finds itself helpless to avoid.

The district judge dealt with the case below in a very painstaking way, more than three years elapsing between his first and third written opinions in it. In June, 1951 he published a written opinion on motion to dismiss, in which the fundamental rights of the parties are discussed at some length.[5] He considered, in that opinion, two cases on which the majority relies,[6] and based his holdings in part upon them. More than a year later, the case was presented on its merits, was thoroughly briefed, and he wrote and published an opinion setting forth the facts in detail, and meeting and deciding all questions of law presented to him then and to us now.[7] He awarded judgment in favor of appellee for $10,801.00. The United States pressed for a new trial, and he granted it a new trial and heard the case again largely on the record of the

first hearing. He gave the same thorough conscientious consideration to the facts and the law, and reached the same result as before insofar as the United States was concerned.[8] The opinions are rare examples of clarity and of dogged perseverance by a judge who was not willing to leave an important case until he had gone to the very bottom of all of its factual questions, and had applied his extended knowledge of Louisiana law and procedure to them. Those opinions are adopted as a part of this dissent, and they furnish to my mind a complete answer to the erroneous conclusions of the majority opinion.

What Judge Dawkins has written is better said than I can say it, but his opinions can well be amplified so as to bring into sharper focus the facts to which he applied the law of Louisiana as set forth in its constitution, statutes and decisions, and the pertinent provisions of the federal Constitution.

Since the chief basis of the majority opinion is that the Levee Board tracked the requirements of Louisiana law, it is well to set out in chronological order just what the record shows with respect to Levee Board action as well as the actions of the United States. May 16, 1928, the Fifth District Levee Board passed a resolution authorizing its officers to pledge to the United States Government that the Board would carry out its obligations under the Flood Control Act of 1928.[9]

June 15, 1929, a further resolution was passed by the Levee Board in the same general terms. Sept. 12, 1945, the Levee Board passed a resolution recognizing

---

3. As district judge, he had written the opinion in Tilden v. United States, D.C., 10 F.Supp. 377, and also in Wolfe v. Hurley, D.C., 46 F.2d 515, affirmed 283 U.S. 801, 51 S.Ct. 493, 75 L.Ed. 1423, which seems to be accepted as a landmark and is relied on extensively by the Government.

4. 107 F.Supp. at page 983.

5. 94 F.Supp. 441.

6. His own opinion in Tilden v. United States, D.C., 10 F.Supp. 377, and the

opinion of the Supreme Court of Louisiana in Dickson v. Board of Com'rs of Caddo Levee Dist., 210 La. 121, 26 So. 2d 474.

7. 107 F.Supp. 981.

8. 119 F.Supp. 749.

9. That Act was changed in material particulars by the Federal Flood Control Act of Aug. 18, 1941, 33 U.S.C.A. § 701 et seq.

that emergency action was sometimes required, and granting to the president of the Board authority "to grant rights-of-way where the need is immediate, the proper right-of-way resolutions to be passed in the regular manner at the following board meeting".

It ought to be noted that this resolution preceded by almost two years the activities leading to this suit, and that at no time did the Board adjudicate, or has anyone contended, that there was any occasion to proceed under emergency powers.

The acts performed by representatives of the United States and of the Levee Board, the contractors and the appellee, as shown in the record, began May 19, 1947 and ended October 10, 1947. May 19th the United States Engineers wrote the Levee Board transmitting plans for enlarging the levees, requesting concurrence in the determination to go forward with the work involved in this litigation and requesting a formal statement from the Levee Board that rights-of-way for enlarging the levee were available. June 10th, the engineers repeated that request.

June 12th, the president of the Levee Board replied, in part, "The Board of Commissioners of the Fifth Louisiana Levee District hereby is glad to comply with your request and render you any assistance possible." [10]   July 9th a resolution was passed by the Levee Board which refers to that letter with apparent approval.[11]

July 15th, the United States Engineers wrote the Levee Board that instructions to begin work had been issued July 10th. Work was begun on one tract July 22 and on the other August 11th.

September 12th, the Box Company learned from outside sources that its timber on the Sharp land was being destroyed. Its then superintendent promptly went to that point and found that a part of the timber on the Sharp place had been destroyed, and immediately set about to salvage what he could of the timber already bulldozed and requested the right to remove that in front of the bulldozer operation. This request was refused. He found that the timber on the Roseland place had already been practically destroyed.

October 10th, substantially four weeks after this destruction had taken place, and actual notice had been imparted to appellee from outside sources, the president of the Levee Board wrote to the fee owners involved, according to lists he had obtained from the tax assessor, a letter reading in part as follows:

"We respectfully request that any buildings, timber or other obstacles which might be within the rights of way be removed prior to the time that the contractor begins work."

The letter referred to the fact that the president of the Board was advised that its inspector had previously notified some of the parties. No notice at all had been given to appellee.

That letter of October 10th was written only to the owners appearing on the assessor's rolls. A list of those owners had been requested by letters from the Levee Board dated June 20th and July 31st. Appellee did not appear on the tax roll, and the Government gives good reason therefor, pointing out that appellee became owner of the fee of one tract only on Sept. 21, 1946, and acquired the timber on the Sharp land on April 9, 1947.

It is not perceived that the correspondence between the Levee Board and the United States Engineers can serve to fix or limit the rights of appellee, or to constitute a substitute for corporate action on the part of the Levee Board. It is fundamental that boards of limited jurisdiction such as the Levee Board can act only through their minutes. The minutes of the Levee Board reflect only

10. It is doubtful if this communication was adequate to give formal assurance that rights-of-way were available.

11. See left column 107 F.Supp. 986. This resolution does not exercise any servi- tude, does not refer to appellee's timber or to any land or property, does not set up any machinery for effecting any expropriation, or provide for any notice to any property owner.

four attempts at corporate action which might affect the rights of the parties to this litigation. None of them referred to appellee's timber or the lands on which it grew and none essayed to exercise or activate any servitude in them. The two resolutions passed respectively in 1928 and 1929 had no reference to any particular land, and served merely to pledge to the United States Government that the Levee Board would carry out generally its obligations under the Flood Control Act. The resolution of September 12, 1945 purported to grant to the president of the Levee Board blanket powers to act in an emergency, subject to confirmation by the Board at the next regular meeting. It could not be contended that the president took any such action respecting the property involved in this suit, and certainly it cannot be said that he granted any right of way to the United States or that the Levee Board ever sanctioned or confirmed any right of way granted by him.

Any support which may be found for the thesis that the levee commissioners essayed to grant to the United States the right to construct levees and destroy appellee's timber, therefore, must rest upon the letter of the president of the Levee Board of June 12, followed by the resolution of the Levee Board of July 9. That letter, as has been pointed out, contained no definite statement that any right of way was available, and made no reference whatever to the timber of appellee or the lands upon which it was growing.

Nor did the resolution of the Levee Board of July 9th make any mention of these lands or of appellee's timber or of any lands or property whatsoever and it did not state that any action was taken towards exercising any servitude. It is inconceivable that property rights may be taken away from a citizen by any such indefinite and informal action. It was not possible that Appellee could have gone to the records of the Levee Board and ascertained that any movement was afoot to attempt to divest it of its valuable property rights.

The majority opinion takes the position that no notice was necessary in the appropriation of appellee's property for levee purposes, and also that notice was actually given to all persons shown by the tax assessor's rolls to be the owners. These two positions will be dealt with in reverse order.

The notice to which the majority opinion refers is a notice given by the president of the Levee Board dated October 10, 1947. It is undisputed that appellee learned from other sources of the destruction of its timber on September 12, and that all of the damage involved in this action had been done prior to the earlier date. Appellee set about with all possible haste to rescue all of its timber which the circumstances would permit as soon as it had notice.

Moreover, the contracts for this work had been let two months prior to September 12th and the engineers knew every detail of the plans when the letter of May 19th was written and forwarded project plans with that letter.[12] Appellee could, without question, have salvaged its timber if either the Levee Board or the United States had followed the normal dictates of courtesy by passing along the word that destruction of this timber was within contemplation and was actually provided for in the contract. As it turned out, however, it would not have been permitted to salvage timber because the Government had already contracted for its destruction by bulldozers in order to save dollars in letting its contracts. At all events, it is difficult to see how notice given October 10th could possibly avail anything when the property sued on had been destroyed prior to September 12th.

The wording of the notice given to landowners on October 10th is significant

12. These plans showed that the timber on appellee's land was to be destroyed in order to lessen the cost to the Government and the Government's brief frankly admits that the contracts "authorized pushing the trees over and out of the way" because "this was a substantially less expensive method".

and shows that the Levee Board recognized that parties to be affected by levee work should be given a reasonable time to remove their removable property: "We respectfully request that any buildings, timber or other obstacles which might be within the rights of way be removed * * * ".

While the Government's brief argues that no notice to landowners or to appellee of the proposed exercise of the servitude is necessary, the major emphasis placed upon its contention that the notice of October 10th was adequate and that appellee had forfeited the right to notice by not placing its timber upon the assessment roll, justifies the assumption that this is also its point of main reliance.[13]

I have been unable to find any convincing authority to support the conclusion of the majority that, under the law of Louisiana, a servitude may be exercised without any notice whatsoever to property owners. To be sure, the district judge did hold in Danziger v. United States, 93 F.Supp. 70, that no formal procedure had to be followed in appropriating property to a servitude. That statement is not tantamount to saying that no notice to owners is necessary before removable property rightfully on the land may be destroyed. Moreover, the statement is by a district judge, and is entitled to no more weight than the contrary finding by the court below in this case. Finally, the authority cited in support of that statement by District Judge Wright does not support it. The holding of Pruyn v. Nelson Bros., 180 La. 760,

157 So. 585, the case relied on, does not relate to notice or to the machinery by which servitudes are exercised. The sole question on which the Supreme Court of Louisiana was passing when it used the language referred to by Judge Wright, was whether the contractors were removing the dirt from the proper location and were taking the proper amount of dirt and were using it for levee purposes.[14]

Referring to that question the Supreme Court of Louisiana said this:[15]

"The contractor, Nelson Bros., did not take the soil for personal or for private use, but for the federal government, the state of Louisiana, and the Pontchartrain levee board, which agreed to furnish the necessary soil for the construction of the levee, and this was, undoubtedly, for public purposes. *The law does not provide that the administrative officers shall follow any particular procedure in exercising the servitude, as in appropriation proceedings.* The customary way is to delgate to the contractor the right to remove the soil from the batture. We conclude that the contractor was therefore not a trespasser and had the right under the authority delegated to remove the soil."

A glance at the other authorities cited by the majority opinion will show that none of them sustains the thesis that no notice to property owners is necessary in exercising servitudes. The first of these is Board of Commissioners of Red River, Atchafalaya and Bayou Boeuf, Levee Dist. v. Trouille, 212 La. 152, 31 So.2d

---

13. These excerpts are taken from various points in the Government's brief: "The Board notified the property owners whose names appeared on the assessment roll (R. 331–333; Exhibit G–14). The appellee here was not notified because it was not on the assessment rolls (Exhibit G–12). * * * Moreover, as discussed in detail later, notice was given to the persons shown to be the owners by the tax assessment rolls to which the constitutional provision refers. * * * It was because the ownership of the timber did not appear on the assessment rolls that no notice was given to the appellee (Exhibit G–12)."

14. Examination of syllabus 6, 157 So. 585 discloses that the editor did not construe the language of Pruyn v. Nelson as having any relation whatever to the mechanics by which Louisiana Levee Boards go about the business of exercising servitudes. The conclusion of law which Judge Wright drew for the Pruyn case, "There is no formal procedure which levee districts must follow in appropriating property" [93 F.Supp. 72], was not justified.

15. 157 So. at page 588. The crucial language is shown in italics.

700, 701. The expropriation there was being conducted under a special act of the Louisiana Legislature, which provided, " 'that before said right of way is appropriated the exact location thereof shall be determined and made to appear by a *proces verbal* prepared by the Board of State Engineers of Louisiana and filed in the conveyance records in the office of the Clerk and Recorder * * *.' "

The Supreme Court of Louisiana merely decided that there had been a substantial compliance with the requirements of that Act and, inferentially, said that the formal entry of this document was a proper notice. That is certainly no authority for the proposition that the Levee Board and the United States can enter upon a citizen's property and destroy it without any effort to notify anybody of the purpose to practice such destruction, even though there was ample opportunity to do so.

Dickson v. Board of Commissioners, 210 La. 121, 26 So.2d 474, does not seem to deal with notice at all. The old case of Peart v. Meeker, 45 La.App. 421, 12 So. 490, contains a good definition of the nature of the servitude attaching to riparian property, but we do not find the matter of notice dealt with at all. This quotation taken from that case [16] is significant:

"It is undoubtedly the duty of the public officers charged by the state with the execution of its police power, to make no greater sacrifice of private rights than the public welfare demands. In several cases this court has said that power so conferred is not arbitrary, and that the citizen is not without remedy to subject it to judicial control in proper cases."

This language is in line with what the Supreme Court of Louisiana said in Pruyn v. Nelson Bros., supra: "This servitude is limited only by the reasonableness of its use, and the administrative officers of the state of Louisiana are charged with determining that limit, subject to review by the courts only when oppression or injustice is shown and proved." One of the supporting authorities for the quoted statement is Judge Dawkins' opinion in Wolfe v. Hurley, D.C., 46 F.2d 515, a landmark in the development of the character and limits of the servitude with which we are dealing.

No authority is found, therefore, for the proposition that the servitude can be exercised against the property of a citizen without notice to him, and certainly no authority for such exercise without any action whatever by the Levee Board. It is indicated by the court below in the second opinion that observance of the provisions of Title 19 of the L.S.A. Revised Statutes of Louisiana would be necessary to comply with the requirements of due process of law.[17]

A glance at this L.S.A. Revised Statutes, Title 19, will show a well rounded and complete scheme of "Expropriation", which, incidentally, is the title of this chapter of the Louisiana Code. Section 1 of the chapter states: "As used in this Part, the term 'property' means immovable property, including servitudes." That chapter provides for pleadings, notice, trial without jury, and other details of procedure commonly found in the exercise of rights similar to those under consideration.

It is certainly not too much to suggest that the observance of the simple requirements of that chapter would bring these proceedings in line with fundamental concepts of what is right and fair, and would bring it into compliance with procedural due process of law. But it is not necessary to hold the Levee Board to such observance in order to affirm this judgment.

It is difficult to understand the position of the majority in holding that the United States had the right to make this assault upon the property of appellee without affording appellee the slightest chance to protect itself, indeed, while forbidding appellee to undertake such self-protection. It is not sufficient to say that appellee bought the timber knowing that

16. 12 So. at page 492.

17. 107 F.Supp. at page 987.

it was subject to the exercise of servitude. The majority refers to the rights of such a property owner as if they were possessed of no substance at all. Here is the way the court below describes the kind of property right appellee had in its timber:[18]

"Notwithstanding the servitude of the civil law, just mentioned, lands fronting on a navigable stream and everything on them having value as property belongs to the riparian owner, down to the mean low water line, LSA–C.C. arts. 455, 457, and may be used, bought and sold even after the construction of levees, the same as any other private property. Timber, oil, gas and other minerals may be taken therefrom by the owner, subject, of course, to the right of the state to insist that levees, public roads, etc., shall not be interfered with or damaged."

What, then, are the rights of the owner of such private property if it be timber, oil, or similar property? If appellee had erected oil derricks under a proper lease, or had constructed oil storage tanks, would it be held that the State of Louisiana or the United States could destroy or confiscate that property without notice or without giving the owner a chance to salvage it? If dwelling houses or places of business such as wharves were used in the legitimate enjoyment of such property rights, could they be similarly destroyed or confiscated? Is timber any different from oil derricks, storage tanks and structures?

The court below pointed out quite accurately that appellee had had no opportunity to have a separate assessment of the timber made,[19] and certainly appellee had been guilty of no such grievous fault as would work a forfeiture of its property. The result would have been the same, however, if the timber had belonged to the owner of the fee whose name appeared on the assessment roll; for the notice to the fee owner was not given until a month after the timber had been destroyed.

It is clear that the court below felt that the actions taken by appellant were repugnant to the just compensation and due process clauses of the Fifth Amendment of the Constitution, and no one would question that the United States was fettered at every stage of the proceedings by their terms. In dealing with the property of its citizens, the great and powerful government should keep its actions above suspicion of unconstitutionality and as far as possible away from the border line of such a charge.[20]

We need not pause to discuss the requirements of the Fifth Amendment that the United States is not permitted to take private property for public use without just compensation beyond observing that it hardly seems fair that the salutary provisions of the Amendment should be nullified by the indirect method of taking provided for in the amended Flood Control Act.[21] We pass up further discussion of that clause because it seems so clear that the action of the Government cannot be squared with the due process provisions.

18. 107 F.Supp. at page 983. This definition of appellee's rights is sustained not only by the statutes referred to but by our decision in Pittsburg & Southern Coal Co. v. Otis Mfg. Co., 249 F. 667, and the Mississippi case citing it, Louisiana & Mississippi R. Transfer Co. v. Long, 159 Miss. 654, 131 So. 84, 87.

19. The Government practically concedes this in its brief: "The reason that appellee's timber was not on the assessment roll may have been, as the court (below) suggested, because its ownership was not severed from the fee at the time

the tax rolls were made up, but that is immaterial under the foregoing rule."

20. Mr. Justice Holmes well expressed the idea in Federal Trade Commission v. American Tobacco Co., 1924, 264 U.S. 298, 307, 44 S.Ct. 336, 338, 68 L.Ed. 696: "We cannot attribute to Congress an intent to defy the Fourth Amendment or even to come so near to doing so as to raise a serious question of constitutional law."

21. It is worthy of note that the Amended Act, 33 U.S.C.A. § 702–a–12 provides for reimbursement by the United States of local authorities of reasonable ex-

The Government sent its contractors onto this land and began destroying wealth in a manner which can be characterized as nothing but reckless, whether practiced by an individual or by the sovereignty. The trees it set about destroying had economic values which should have been conserved under the most rudimentary concepts of what is fair and right and consistent with husbandry.

The most superficial inquiry would have revealed the owner of this timber because the deeds were of record. The government had taken initial steps to begin the prosecution of this work four months before the date of actual beginning. The only precaution it had taken was to write a letter to the Levee Board requesting that it be "furnished a formal statement by your board that rights-of-way are available for the construction of the enlargement." If the investigation had been pursued, the government would have found that the Levee Board had not taken any steps or made any minute entries relating to these particular lands or this timber, had not made the first move towards a formal expropriation of the rights of way or the timber on them, and had not notified the property owners that any expropriation was in contemplation, or that any entry upon their lands would ensue.

The simplest dictates of fairness would have required, in any event, that the Government give the property owners the opportunity to remove things of value from the right of way before their destruction should be begun. If the government had the right to begin destroying timber without notice, it would have had the like right to turn waters upon the lands of these owners without affording opportunity to remove livestock. Whatever muniments of title the Government may have had to the right of way, and whatever assurances it may have possessed with respect to right of entry upon the lands, it had no right whatever to make its entry in such a harsh and ruthless way and with such a wanton disregard of all of the dictates of justice and humanity.

The foregoing considerations are based upon the assumption that the destruction of the trees was inadvertent and innocent. The fact is, however, as conceded by the government, that the destruction was deliberate and was planned from the outset, and such planned destruction was disclosed to the Levee Board when the government engineers forwarded to that Board a set of the plans on May 19th.

The Government could save money by permitting the contractor to push whole trees off of the land it was clearing so that dirt might be obtained for levee purposes, instead of permitting appellee to fell and remove the timber, leaving the stumps to be removed by the contractor. "This was a substantially less expensive method than removing the stumps which appellee's salvaging operation would leave." [22] That statement from the government's brief, followed by the assertion "It was pushed over, and thus destroyed, by bulldozers because the contractors' bid was substantially reduced 'on the basis of that method of removing the timber'", leaves no room to doubt that the Government made its plans and let its contracts on the basis of the destruction; and that is verified by the refusal of the contractors to comply with appellee's request, made as soon as he discovered the depredations, that he be permitted to cut the timber which remained in front of the bulldozers.[23]

But such a course is forbidden by the due process clause of the Fifth Amendment, and what the courts have said in defining its scope and application. Mr. Justice Lamar, speaking for the Supreme Court in a case involving a forced track connection by a railroad,[24] laid down the

penditures under local laws and customs; and the government engineer testified that "since 1941 the Federal Government has been paying a fair market value for lands used or destroyed in the carrying out of flood control plans."

22. See statement from government brief, Note 2, supra.
23. Ib.
24. State of Washington ex rel. Oregon R. & Nav. Co. v. Fairchild, 224 U.S. 510, 524, 32 S.Ct. 535, 538, 56 L.Ed. 863.

rule that such an order could not be sustained, "merely because of the fact that the carrier had been given an opportunity to be heard, but was to be tested by considering whether, in view of all the facts, the taking was arbitrary and unreasonable * * *"; and held further that the railroad must not be denied the right to show that "the order was so arbitrary, unjust, or unreasonable as to amount to a deprivation of property * * *." And the Supreme Court also held [25] that the Fourteenth Amendment "is concerned with the substance and not with the forms of procedure".

Mr. Justice Brandeis, in his concurring opinion in the St. Joseph Stockyards case,[26] first used the term "inexorable safeguard" in holding that no step in a proceeding affecting the rights of a citizen shall be taken "except upon due notice and opportunity to be heard". Mr. Justice Cardozo [27] defined due process as "the protection of the individual against arbitrary action", and repeated again that its essence was the observance of " 'the rudiments of fair play' ".

That decision was cited by us in our recent case of City of Meridian, Miss. v. Mississippi Valley Gas Co.,[28] a case in which we affirmed the action of the lower court in restraining the enforcement of a city ordinance passed without constitutionally adequate notice. We also cited the case of Morgan v. United States in which the Supreme Court twice [29] reversed administrative proceedings for failure to observe the "fundamental requirements of fairness which are of the essence of due process".

And we have recently, in Arndt v. United States,[30] held that government officials must conform their actions to accepted standards of fair play whether those standards are set forth in statutes or regulations or derived from the common acceptation of what is fair in dealings between man and man.

What the government did in the present case is at war with all of those concepts and ought to be rejected by us, whether we base the rejection on the failure of the Levee Board to observe Louisiana law or upon the higher ground of failure of the United States to observe common standards of justice and fair play. I do not think this court should give its support to such wanton, unjust and unconstitutional actions. I think the judgment of the District Court was right and should be affirmed.

Rehearing denied: CAMERON, Circuit Judge, dissenting.

25. State of Missouri ex rel. Hurwitz v. North, 271 U.S. 40, 42, 46 S.Ct. 384, 385, 70 L.Ed. 818.

26. St. Joseph Stockyards Co. v. United States, 298 U.S. 38, 73, 56 S.Ct. 720, 735, 80 L.Ed. 1033.

27. Ohio Bell Telephone Co. v. Public Utilities Commission of Ohio, 301 U.S. 292, 302, 57 S.Ct. 724, 729, 81 L.Ed. 1093.

28. 1954, 214 F.2d 525, 526.

29. 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 and 304 U.S. 1, 58 S.Ct. 773, 777, 999, 82 L.Ed. 1129.

