FOURNET, Justice.
 

 The plaintiff, C. Bickham Dickson, is seeking to recover from the Board of Commissioners of the Caddo Levee District and the Board of Commissioners of the Bossier Levee District, in solido, the suma of $22,400 (with reservation of his right to sue for further damages) as com
 
 *126
 
 pensation for that portion of his plantation, known as Sunflower Plantation, situated on the left descending bank of the river lying on the river or unprotected side of the levee and the pecan trees and crops thereon destroyed by repeated and constantly increasing erosion caused by the artificial current created in the river and thrown against his plantation at a right angle by reason of .the cutting by these levee boards under joint agreement of two straight channels or cut-offs across two tracts of land peninsular in shape lying within the river side of the levees approximately a mile above his property, one being in the bend of the river on the west or Caddo parish side and known as Fire Point, the other being in the bend of the river on the east or Bossier parish side and known as Shreve’s Island.
 

 • The defendants, after their exceptions of no cause and no right of action were overruled, filed separate answers which, in substance, are identical, it being admitted that the channels were cut as alleg.ed in plaintiff’s petition but asserted that this action was taken for the mutual benefit of the two levee boards and for the good of the public generally. They averred further that despite the expenditure of large sums of money for the building and protection of levees and banks they were confronted with a serious situation involving the loss of all of the levees and properties in the vicinity of the two cutoffs, including the plaintiff’s, if something was not done immediately and that it was to solve this situation that, upon the recommendation and with the approval of the State Board of Engineers these cut-offs, were made and that they not only corrected the mischief sought to be remedied but also enured to the benefit of all of the properties along these cut-offs including the plaintiff’s, whose loss by erosion on the southern portion of his plantation was. compensated by the accretions forming on the northern portion thereof. The defendants further averred that the plaintiff acquired this property with full knowledge of the existing conditions as well as with full knowledge of the law of this state relative to the obligation of a riparian owner abutting this river. They also specially pleaded the prescription of one year.
 

 The case was tried and submitted on the issues as thus made up and the trial judge rendered judgment against the defendants, jointly and in solido in the sum of $5,000. The defendants appealed and answering-this appeal the plaintiff asks that the judgment rendered in the lower court be amended to award him the amount originally sued for.
 

 It is the contention of the appellants, which not only forms the basis of their exceptions but also the defense set out in their answers, that since the plaintiff’s, claim is for the loss of his property due to the destruction thereof by the action of the defendant boards in the performance of a legal duty to prevent the colr lapse of the levees along this river and
 
 *128
 
 the ultimate protection of the properties ■abutting thereon in their respective districts behind these levees, his right to recover therefor is under Section 6 of Article XVI of the Constitution of 1921 providing that lands and improvements “actually used or destroyed for levees or levy drainage purposes * * * shall be paid for at a price not to exceed the assessed value for the preceding year,” and since the plaintiff has failed to avail bimself of the rights given him thereunder by specifying in his petition the assessed value of his land, he has no cause •of action under the holding of this court in the case of Lacour v. Red River, Atchafalaya & Bayou Boeuf Levee District, 158 La. 737, 104 So. 636.
 

 On the other hand the plaintiff’s contention is that the suit was not brought un-. der Section 6 of Article XVI of the Constitution of 1921 for property actually taken or destroyed for levee purposes, but, instead, was brought under Section 2 of Article I of the Constitution of 1921 (as well as the similar provisions to be found in the Fifth amendment to the Constitution •of the United States) guaranteeing that private property shall not be taken or damaged except for public purposes and ■after just and adequate compensation is paid, for his property was
 
 destroyed
 
 for public purposes under the authority of Act No. 7 of 1884 granting levee boards the authority to cut across bends of streams for the purpose of straightening them and was not
 
 used
 
 for levee purposes as contemplated by the servitude imposed .thereon in our Revised Civil Code, particularly Article 665.
 

 Despite the constitutional guarantee that one cannot be deprived of his property except for public purposes and then only after adequate indemnification in the manner prescribed by law, in this state prior to the adoption of the Constitution of 1921 property used for the construction and drainage of levees was not paid for outside the district under the control of the Orleans Levee Board (and even in that district compensation was not paid prior to the Constitution of 1898, which constitution in Article 312 provided that the owners of such land had a right of action against the Orleans Levee Board for “the value of said property”) for the very simple reason that under the express provisions of the laws of this state a servitude was imposed upon all lands bordering on navigable rivers and streams for the construction and maintenance of levees, roads, and other common or public works. As was pointed out by the Supreme Court of the United States in Eldridge v. Trezevant, 160 U.S. 452, 16 S.Ct. 345, 347, 40 L.Ed. 490, quoting with approval from Ruch v. New Orleans, 43 La.Ann. 275, 9 So. 473, “ ‘the riparian owner enjoys his property sub modo, i. e., subject to the right of the public to reserve space enough for levees, public roads, and the like. Over this space the
 
 *130
 
 front proprietor never acquires complete dominion. It never passes free of this reservation by a deed to a purchaser.’ ”
 

 By adoption of Section 6 of Article XVI of the Constitution of 1921 it.was specifically provided that “Lands and improvements thereon hereafter actually used or destroyed for levees or levee drainage purposes * * * shall be paid for at a price not to exceed the assessed value for the preceding year.” In the case of Boyce Cottonseed Oil Mfg. Co. v. Board of Commissioners of Red River, Atchafalaya and Bayou Boeuf Levee District, 160 La.
 
 727,
 
 107 So. 506, this language was compared with that used in Article 312 of the Constitution permitting riparian property owners to recover “the value” of land used for levees and levee drainage purposes in the district under the control of the Orleans Levee Board and concluded that because of the inclusion of the above quoted provision in the 1921 Constitution it was the intention of its drafters that the test of the value of such land as between the state and the property owner would be the amount it was assessed for the preceding year; further, that since the state has always had a right of servitude over rural riparian property that it could have exercised without paying any compensation, the amounts thus awarded the owners of these lands in the Constitution of 1921 was “purely gratuitous.” As expressed in Mayer v. Board of Commissioners for Caddo Levee District, 177 La. 1119, 150 So. 295, 296, “It is a payment made by the agency of the state — -the levee district — for what already belonged to the state at the time of the adoption of the Constitution.” This court also held in Lacour v. Red River, Atchafalaya & Bayou Boeuf Levee District, 158 La. 737, 104 So. 636, that a petition that does not allege the property thus appropriated by the state for levees and levee drainage purposes was assessed during the preceding year and the amount of such assessment, does not state a cause of action.
 

 The plaintiff concedes this to be the law of this state but contends that the joint action of the defendants in creating these two cut-offs was neither for the repair or construction of levees but for the protection of private property in the respective levee districts from the caving banks of Red River and to relieve these defendants of the necessity of having to rebuild these levees. at points some distance back from the banks.
 

 The defendants concede these' cut-offs were not made for the building or repair of any levee but they claim it was done for the purpose of preserving from further destruction the levees already in existence along these banks and to protect valuable property in their respective districts from floods; consequently, that such action comes within the contemplation of Article 665 of. the Revised Civil
 
 *132
 
 Code creating the servitude for the making and repair of levees.
 

 In order that the proper construction may be placed on the articles of our code relative to this servitude, it is necessary that we understand the conditions that have existed in this state and the historical background that has given rise to our laws authorizing the appropriation of riparian lands for levee purposes, their construction and maintenance.
 

 From the earliest Colonial days, when the Louisiana Territory was in the possession of France and Spain, no grants of lands were ever given without a specific reservation being made therein for the common use of the public of all rights to the shores of rivers arid bayous upon which they might front. These two countries never divested themselves of title to lands lying immediately adjacent to navigable streams. This policy, during the Spanish occupation of the territory, became merged with the law relative to servitudes to be found in the ancient Las Siete Partidas of Spain and, in time, found its way into the First Civil Code adopted by the Territory of Orleans (comprising what is now known as the State of Louisiana) in 1805, after the Louisiana Territory had been acquired by the United States, the basic principles relative to servitudes in Las Siete Partidas being included therein almost verbatim, thus insuring that the shores of navigable rivers and streams in this state would always be kept free for the public for levee and other public purposes. These provision's remain in our codal law today, with the result that while in all of the remaining states of the Union lands necessary for leveee purposes can only be used after expropriation and proper indemnification, in Louisiana the state has the right tó act first, i.e., the authority to appropriate such land to a use to which it is subject under its very title, and talk later.
 

 The increasing importance of levees and the levee system in this state has disclosed how vitally necessary this is. Even in the early days it became apparent to the settlers along the numerous streams, particularly to those along the Mississippi, that larids fronting thereon were of little or no value if the arable soil was not protected from overflow and inundation., Consequently, clauses were inserted in land grants imposing upon the grantees the obligation of building levees on these lands and of keeping such levees in repair. As early as 1727 a levee was constructed in New Orleans by the then French governor and in 1743 an ordinance commanded planters along the Mississippi to make their levees safe under penalty of the forfeiture of these lands to the Crown.
 

 The riparian owner did not fare any better by the transfer of the Louisiana Province to Spain. The persons obtaining concessions along the river banks under the government of that country were commanded in 1770 to construct levees
 
 *134
 
 sufficient to prevent inundation during the
 
 first
 
 year of their possession of these lands.
 

 From this time the obligation of the riparian owner became perceptibly more harsh, although we do find in 1808 the first indication that the levees were thought to be so important their construction and maintenance could not be safely left up to the individual owners for at that time it was required that the permission of 12 inhabitants of plantations along the banks of a stream had to be secured before a levee could be placed in front of ime already in existence. In 1816 land owners along the Mississippi were required to keep at least one slave or other person constantly at work on the levees fronting their property and they were made liable for any damage suffered by other planters if a break occurred in their levee. Inspectors were appointed to supervise these works with authorization to requisition slaves from other plantations, in cases of emergency, at the expense of the owner permitting his levee to “leak.”
 

 The philosophy that the riparian owner alone should bear the obligation of protecting all people and their possessions from overflow then began a gradual but certain change. The obligation was shifted from the riparian owner and his burden somewhat lightened in 1852 by the formation of the first levee district and the levying, in addition to revenues derived from the sale of overflowed and swamp lands granted the state by Congress, of a tax to raise funds for levee work. The old system . of requisitioning slaves was abolished a year later and in 1866 all laws authorizing the construction of levees at the expense of the riparian proprietors were repealed. Act No. 20 of 1866; Russell v. Board of Commissioners of Lake Borgne Basin Levee District, 159 La. 330, 105 So. 361. The levees had become so important to the public in general by 1878 that it became apparent the task was no longer one that could be placed on the shoulders of any one man or group of men. An efficient and unified plan that would protect the entire state against inundation was necessary. It was for this purpose that the Board of State Engineers, originally created by Act No. 7 of 1871, was reconstituted and the duty imposed upon it of, among other things, carefully surveying the water courses and levees of the state and reporting to the governor the improvements necessary and the levees to be constructed “which are of prime importance to the State at large.” Act No. 5 of 1878, Ex.Sess. From that time the construction, maintenance, and supervision of the levee system of this state has been entirely a governmental function, exercised for the benefit of all of the citizens by the state.
 

 But this reversal of philosophy with respect to the obligations of the individual riparian owners has not resulted
 
 *136
 
 in a change with respect to the state’s authority to take possession of lands deemed necessary for the construction and repair of levees. Despite the repeated contention in numerous litigations that Article 665, imposing this servitude on riparian lands, controverts the constitutional guarantee in both the state and federal Constitutions that no one can be deprived of his inalienable rights of property without due process of law, it has been consistently held by this court and by the Supreme Court of the United States that such constitutional requirements relate to the right of expropriation and do not have the effect of abrogating our law giving the state authority to appropriate land upon which rights for the construction of levees, roads, and other such public works have always been reserved.
 

 In 1898, for the first time, compensation was allowed for such lands, but this constitutional provision was limited to the district under the jurisdiction of the Orleans Levee Board and until the Constitution of 1921 provided for payment for these lands at a price not to exceed the assessed value for the preceding year, without any limitation as to any specific section of the state, the owners of property in rural areas were still compelled to relinquish their lands along navigable streams without receiving any compensation therefor.
 

 Thus it may be seen that in Louisiana, the catch basin of the central part of the United States, flood control has always been of utmost importance. This state’s protection from the ruinous effects of the inundations to which Louisiana has always been subjected because of geographical location and the numerous streams and waterways honeycombing the area, depends upon it.
 

 There is no question but that from earliest times riparian lands have been subject to this servitude. There is also no question that but for the provisions in Section 6 of Article XVI of the Constitution riparian owners throughout the state would be today entitled to no compensation whatever for lands taken, used, or destroyed for levee purposes. And however unfair it may seem to the owners of this type of land they are without right to complain because their acquisition of such land was subject by law to this ancient servitude and the private mischief must be endured rather than the public inconvenience or calamity.
 

 When the levees throughout the state were first put under the jurisdiction of the police juries of the respective parishes in 1887, it was for the purpose of vesting “the control and management of public levees” in these bodies and they were given all powers necessary and incidental thereto for they were authorized “to make such regulations as are necessary and proper for the repairs and construction of levees.” Act No. 140 of 1877, Ex.Sess. This fundamental and primary object has
 
 *138
 
 never been changed, though jurisdiction over these matters has.
 

 In Act No. 5 of 1878, Ex.Sess., reconstituting the Board of State Engineers, this board was directed to report to the police juries the extent of repairs to be made with estimates and specifications of the work. By Act No. 88 of 1880 these police juries were
 
 "invested, with the management and control of all completed public levees in this State, which may require public catre for protection and preservation, and they are hereby authorized and required to make such laws as may be necessary and proper for their repair, preservation and protection.”
 
 These duties eventually developed upon the levee boards throughout the districts of the state, but there was no fundamental change. For example, Act No. 74 of 1892, creating the Caddo Levee District (one of the defendants in this action), stipulated that under its jurisdiction would lie “All alluvial lands and all lands subject to or liable to overflow from the waters of the Red River or its tributaries or its outlets, on the
 
 zvest
 
 side of the Red River south of the Arkansas State line.” Its board was directed to “devise and adopt rules and regulations for the carrying into effect and perfecting of a comprehensive levee system, having for its object the
 
 perfect
 
 protection of the
 
 entire
 
 district from overflow,” and it was given the power “to do and perform any and all acts, necessary to carry out the objects of this Act, viz; the thorough and perfect protection of the lands of this District from damage by flood and for the perfect drainage of the same.” These identical provisions are included in Act No. 89 of 1892 creating the Bossier Levee District, the other defendant in the case, with the exception that its functions were limited to the
 
 east
 
 bank of Red River. (Italics ours.) '
 

 It is obvious, therefore, that these boards, with the assistance and under the supervision of the then State Board of Engineers (changed by Act No. 2 of 1942 to the Department of Public Works), had the greatest possible latitude in locating these levees and in determining the mode and place of building them, and the riparian owners had no other recourse than to submit. These boards are not compelled to follow the meanderings of the streams. If found to be more expedient they can locate the levee a distance back from the shore. The action of these governmental agencies in locating, building, and maintaining levees is jurisdictional and is not subject to review unless there has been some palpable abuse. Peart v. Meeker, 45 La.Ann. 421, 12 So. 490; Dubose v. The levee Commissioners, 11 La.Ann. 165. And the right to construct these levees certainly carries with it the right to protect them in any manner found to be most expeditious from an engineering, economical, and practical standpoint.
 

 It is our opinion, therefore, that whether the levee boards in this case took
 
 *140
 
 plaintiff’s property for the construction of a levee and its drainage or whether such property was destroyed as a result of such taking, either in the construction of a new levee or the repair, maintenance, or protection of an old one, is immaterial, for the only redress given to the owners of the lands thus taken, used, or destroyed is to be found in Section 6 of Article XVI of the Constitution of 1921.
 

 It is obvious that the authority given the levee boards in Act No. 7 of 1884 to cut across bends of streams for the purpose of straightening them contemplated the correction of just such a situation as confronted the defendants in this case and we think the property taken for the two cut-offs as well as the property destroyed as a direct consequence thereof was used or destroyed for levee purposes within the contemplation of this provision of the Constitution of 1921 and is, there•fore, compensable in accordance with the provisions of this said section, i.e., at a price nót to exceed the assessed value for the year preceding the taking or destruction thereof. Consequently, the plaintiff, having failed to allege in his petition that the property so destroyed was assessed for taxes during the preceding year and the amount of such assessment, discloses no cause of action under the holding of this court in Lacour v. Red River, Atchafalaya & Bayou Boeuf Levee Dist., 158 La. 737, 104 So. 636.
 

 For the reasons assigned the judgment of the district court is annulled and set aside, the defendants’ exception of no cause of action is maintained; and the plaintiff’s suit is dismissed at his cost.
 

 O’NIELL, C. J., absent.
 

 KENNON, J., recused.