446 So.2d 1240 (1983)
Samuel L. LIEBER, Plaintiff-Appellant,
v.
Charles M. HAMEL, et al., Defendants-Appellants.
No. 15829-CA.
Court of Appeal of Louisiana, Second Circuit.
November 29, 1983.
Rehearing Denied December 22, 1983.
Writs Denied February 27, 1984.
Kennedy, Goodman & Donovan by Frank S. Kennedy, Shreveport, for plaintiff-appellant.
Peters, Ward, Bright & Hennessy by Hugh T. Ward, Shreveport, for defendants-appellants.
*1241 Before MARVIN, JASPER E. JONES and FRED W. JONES, Jr., JJ.
MARVIN, Judge.
In this petitory action, both litigants appeal a judgment which attempted to resolve ownership of strips of land underlying existing and former portions of the Red River levee system in east Caddo Parish immediately north of 70th Street in Shreveport.
On this simplified plat, the strips in dispute are approximately 75 feet in width and extend about 500 feet from point A to point B and about 1,200 feet from point B to point C:

The A-B strip, which is shown by dotted lines, once was underneath a levee that was severed from the levee system by the levee board and that was later bulldozed and removed by the Hamel defendants' ancestor who first acquired title to lots in *1242 Dixie Meadows Subdivision contiguous to the A-B strip by a deed of June 1, 1938. Hamel acquired title to other lots and property between the first acquired property and 70th Street at later times. The Hamel property is north and east of the levees which now exist. Hamel does not have record title to either strip in dispute. Hamel was recognized as owner of the A-B strip on the basis of 30-year acquisitive prescription because of his acts of possession. CC Art. 3486. Hamel also exercised similar acts of possession over the B-C strip. The B-C levee was not abandoned and, of course, had not been removed.
The plaintiff, Dr. Lieber, was recognized as owner of the B-C strip by virtue of a May 2, 1974, deed from a liquidator, who was appointed by order of the district court on that date, for a corporate successor in title to the subdividers who developed and sold lots on both sides of the levee system. Dr. Lieber instituted the petitory action on April 19, 1968, but was found not to have record title to these strips until he obtained the liquidator's deed in 1974. Dr. Lieber does not dispute the finding that he has not corporeally possessed the strips in dispute. In his original 1968 petition he alleged Hamel's possession of the strips, but amended his allegations in 1973, and has contended since then that Hamel could not legally possess the A-B or B-C levees or property beneath these levees.
Dr. Lieber contends the trial court erred in making findings that he did not have title before the liquidator's deed of May 2, 1974, that his original petition of April 19, 1968, did not interrupt accrual of acquisitive prescription, and that Hamel had acquired title to the A-B strip by 30 years acquisitive prescription.
The Hamel defendants contend that the trial court erred in holding that Dr. Lieber acquired title to the strips by virtue of the liquidator's deed in 1974 and in holding that they could not legally possess the B-C strip to acquire ownership by acquisitive prescription, notwithstanding the finding of physical acts of possession for 30 years. We affirm the judgment for reasons here assigned which summarize, with some modification, the findings and reasons assigned by the trial court.

ADDITIONAL FINDINGS
On June 1, 1938, Hamel acquired Lots 1, 2, 3, and the north half of Lot 4 of Dixie Meadows Subdivision, which was created by a plat filed on May 4, 1928. Earlier in 1928, Dixie Gardens Subdivision had been created west of the levee. The levees A-B and B-C are shown on the subdivision plats. Dixie Meadows Road was dedicated as a public road on the Dixie Meadows plat parallel to and between the levee (A-B, B-C) and the lots of Dixie Meadows Subdivision east of the levee. This road between those points, however, was never used or developed as a public road and the area between the lots and the levee remained open land, unfenced. The east line of the lots of Dixie Gardens Subdivision was fenced from points B-C. The west line of Dixie Meadows Subdivision was not fenced.
Hamel's 1938 deed to the Dixie Meadows lots states that it "is executed in compliance with provisions of contract of sale entered into by the parties [on] March 31, 1937 ..." Hamel moved onto the lots in 1937 and operated a dairy farm and began possessing the A-B, B-C levee as owner. Hamel's cows grazed across the levee and up to the Dixie Garden fence. He also pastured cows west of the A-B levee and grew corn and raised a garden across this levee. The Hamels later purchased this small tract. The Hamel homesite was and is situated on the south bank of the Ox Bow Lake near the A-B levee. The driveway to the home is essentially parallel to and within a few feet of the A-B strip.
As is shown on the plat which we have simplified and reproduced, the course of Red River changed after the Dixie subdivisions were platted in 1928. The record reveals that the banks of the river caved in and that most of Lots 1 and 2 of Dixie Meadows was lost to the river and is now under the ox bow lake. The original levee, which was built sometime before 1928, extended northwesterly about 1,200 feet from *1243 point B beyond point A before it turned southwesterly. The dotted lines show these extensions of the A-B levee. The northernmost 700 feet of this levee was taken by the river so that only about 500 feet remained in 1937-38 when Hamel began his possession. The 500 foot (A-B) remnant extends only to the edge of the Ox Bow Lake. The 1938 deed to Hamel recites that the property contains approximately 155 acres, that the seller does not guarantee the amount of acreage, and that it is understood that the "greater part of Lot 1 has caved into ... the river." The acreage originally platted in Lots 1, 2, 3, and the north half of Lot 4 totaled more than 165 acres. Lot 1 originally contained 23.7 acres of this total.
The river had made its maximum encroachment and the "new" levee extending westerly from point B had been constructed before Hamel moved onto the property. The administrator, executive officer, of the Caddo Levee District was not asked to and did not deny this testimony during the trial. In a motion for a new trial in the district court, which was eventually denied, Dr. Lieber sought to have the case reopened to allow this executive to establish that the new levee was constructed in late 1936. A reproduction of the levee district's map, filed there and also filed here as a part of a supplemental brief, purports to show the changes in the course of Red River. This map is also in evidence as plaintiff's exhibit eight. The bank lines of Red River shown on this map confirm that the river made its maximum encroachment onto the levee system north of and onto the Dixie subdivisions between 1931 and 1936. It also indicates that the A-B extended levee which was taken by the river was not built until 1930 or 1931, but this indication is contrary to affirmative testimony and to the 1928 subdivision plats, showing that the levee existed in 1928. In any event, the evidence clearly establishes that the new levee was constructed and the A-B levee was cut from the system more than 30 years before Dr. Lieber instituted the petitory action. Hamel had the remnant of the A-B levee leveled when he erected a new home in the early 1950s.

THE LEVEE SERVITUDE AND ACQUISITIVE PRESCRIPTION
The levee servitude is a peculiar legal servitude which has a most interesting history in Louisiana. CC Art. 655, Dickson v. Board of Com'rs of Caddo Levee Dist., 210 La. 121, 26 So.2d 474 (1946); Yiannopoulos, Vol. 2, Louisiana Civil Law Treatise, "Property," 2d Ed., § 56. A continuous and effective levee system has been and is of vital importance to this state.
The exercise of a levee servitude, however, does not make the levee or the land beneath the levee a public place, incompatible with the retention of private ownership within the meaning of CC Art. 482. Green v. Chamberlain, 60 So.2d 120 (La.App. 1st Cir.1952). While this case recognized that the owner of an estate which is burdened with an existing levee servitude may be deemed to be in possession of the levee for some purposes, a person who is not the owner of the subservient estate cannot legally possess the existing levee adversely to the owner. That is the apparent holding of Caillier v. Profito, 171 La. 693, 131 So. 851 (1930). There the court held that Profito's adverse possession "could not have commenced until the levees were abandoned..." 131 So. at p. 852, emphasis supplied. The most obvious reason for precluding adverse possession of an existing levee that serves the public purpose is that the public purpose is of such importance that it is incompatible with private ownership except in limited situations such as Green. Caillier, supra. CC Art. 482. See Dickson, supra. Compare Louisiana Highway Commission v. Raxsdale, 12 So.2d 631 (La.App. 2d Cir.1943).
The right of the levee authority to remove obstacles placed on levees by private citizens which may obstruct the maintenance and efficiency of the levee has been long recognized. See Hathorn v. Board of Commissioners, 218 So.2d 335 (La.App. 3d Cir.1969), cases and statutes cited therein.
*1244 In Raxsdale supra, it was squarely held that the proprietors of a city lot could acquire, by adverse possession, title to an adjoining strip of land sold by their ancestors to the city for a public street more than 50 years before, but which was never used as a street. Caillier, supra, held that a levee, once abandoned but not removed by the levee board, could be acquired by adverse possession.
Dr. Lieber recognizes such holdings, but contends that acquisitive prescription should not begin to accrue until the servitude is extinguished by 10 years nonuse liberative prescription. CC Art. 753. This argument fails to distinguish liberative from acquisitive prescription and implies that a levee servitude may be extinguished by and only by the 10 year nonuse liberative prescription. See CC Arts. 3445, 3448. Dr. Lieber cites Champagne v. Bourque, 117 So.2d 325 (La.App. 1st Cir.1959) to support his contention. Champagne held that the strip there in question was never used as a public road and added the observation that if it was a public road it had long been abandoned by 10 years nonuse. We see valid distinctions between the public road servitude and the public levee servitude.
In the absence of a written or other formal dedication of a public road, the public may acquire a servitude or right of way only by formal expropriation or by public maintenance or use for a period of years. See Yiannopoulos, supra, § 61. A levee servitude may be exercised almost instantaneously and without expropriation. The levee authority has the "greatest possible latitude" in exercising and re-exercising its authority to appropriate riparian lands for levee purposes. See Dickson, supra. The public road servitude, once established, is an affirmative servitude, requiring use, while the levee servitude is a negative servitude. CC Art. 706. The ordinary public road servitude on private property must somehow be created. The levee servitude on private property exists by operation of law and need not be created in the sense that a public road is created.
Once the levee board built the new levee and cut the A-B remnant at point B from the levee system, the public purpose of the A-B levee ended and it became susceptible of being adversely possessed. Certainly the levee board could have tied the A-B remnant onto a newly constructed levee to complete and continue the system of levees designed for controlling floods. The levee board chose to tie the new levee to the system at point B rather than at point A and severed the A-B remnant from the system.
CC Art. 751, adopted by Act 514 of 1977, reproduces the substance of Articles 783(1) and 784 of the Louisiana Civil Code of 1870 and does not change the law as to how servitudes are extinguished. Comments, LSA-CC Art. 751. Servitudes are extinguished, not only by liberative prescription of nonuse in the case of affirmative servitudes such as right of way, but by the destruction or change in the thing subject to the servitude which precludes the use or existence of the servitude. CC 751.
CC Art. 751 speaks of the permanent and total destruction of the part of the servient estate which is burdened with the servitude. Former CC Art. 783(1) spoke of such a change taking place that the thing subject to the servitude could not be used. Former CC 784 echoed and spoke of extinguishment of the servitude when the things were perpetually in such a situation that they could no longer be used. Former CC Art. 783(5) spoke of the tacit remission of a servitude by the one to whom the servitude was due.[1]
A levee servitude should not be subject to the liberative prescription of 10 years nonuse. CC Art. 753. This should be axiomatic because of the very nature and purpose of the levee servitude. A levee simply is not used by humans in the *1245 legal sense of the use made of an affirmative servitude such as a right of way. A levee exists only as a part of a continuous system or series of levees designed to control and protect against flooding. Once erected and incorporated into the system, it need not be "used" by man to maintain its legal existence. Once a strip of levee caves in and is then intentionally disjointed from and physically abandoned by that system, it may still exist, not as a levee, but simply as a manmade accumulation or pile of dirt. It is true in the ordinary sense that the disjointed strip is no longer "used" as a part of the system, but that nonuse is not the servitude use concept of the civil code, in the legal sense, which is applicable to affirmative servitudes. Since Act 514 of 1977, it may be that nonuse liberative prescription could be held applicable to a negative servitude but we need not, and do not, reach that issue. See footnote one.
Dr. Lieber emphasizes the absence of a recorded title in Hamel to the levee. A title based on acquisitive prescription of 30 years does not depend upon a written or recorded title, but upon acts of adverse possession which meet the requirements of law. CC Art. 3486. We assume, as Dr. Lieber argues, that his title to the strips in dispute antedate his institution of the petitory action in 1968. This assumption makes it unnecessary for us to decide whether Hamel may question the efficacy of the 1974 liquidator's deed to Dr. Lieber. We find, however, that Hamel began his acts of possession as owner over the strips in dispute in 1937, more than 30 years before Dr. Lieber instituted the action.
Hamel's claim of prescriptive title is asserted against Dr. Lieber, as the assumed [and alleged] record title owner, and not against the levee authority, which owns nothing other than the legal levee servitude, according to this record. LRS 38:295, which states that acquisitive prescription does not run against lands owned by levee boards, has no application to this case because the levee board did not own the land. When all arguments and specifications of error are considered, the issues, as we perceive them, essentially are
whether an acquisitive prescriptive title may be acquired against a servitude levee which exists as a part of a continuous levee system designed to control and protect against flooding,
whether an acquisitive prescriptive title may be acquired against the remnant of a servitude levee which no longer exists as a part of a continuous levee system, and if so, when does that prescription begin to accrue.
We answer and hold that an adverse possessor may not acquire prescriptive title to a servitude levee which exists as a part of a continuous levee system designed to control and protect against flooding. We make this holding because of the paramount importance of that system. Caillier, Dickson, supra.
As to a levee which no longer exists as a part of the continuous levee system because it is no longer important and necessary to the purpose of the system and which has been effectively and substantially destroyed within the meaning of CC Art. 751 and intentionally severed from the system, our answer is different. We hold that an adverse possessor may acquire prescriptive title against the owner of lands underlying the severed levee in such circumstances. We further answer that this prescription begins to accrue when the levee authority effectively completes the destruction of such a levee by severing or cutting that substantially destroyed levee from the system and builds a new levee to preserve the continuity of the system. We find that the A-B levee was cut or severed from the system by the levee authority before Hamel began his possession. Even though the southernmost 500 foot remnant of the 1,200 foot original levee remained after the river encroached and caved in 700 feet of the original levee, the remnant was effectively destroyed when the levee authority cut its southernmost connection at point B and there built and continued the levee system in a westerly direction. This *1246 destruction extinguished the levee servitude that once was exercised by the levee authority on the A-B strip and its northernmost extension. CC Art. 751.
Except to the extent here modified, we adopt the findings and detailed reasons for judgment of the trial court. We find no error in the judgment appealed. Costs of the appeal are assessed one-half to each appellant.
AFFIRMED.
NOTES
[1] Former CC Art. 816 also stated that servitudes may be renounced or released, expressly or tacitly, by the owner of the dominant estate. CC Art. 771, adopted by Act 514 of 1977, suppresses the rule of Arts. 817, 816, and 783(5) that renunciation may be tacit. Comments (a), LSA-CC Art. 871. This change in the law is not retroactive and became effective on January 1, 1978.