| iNORRIS, Judge.
The Board of Commissioners of the Fifth Louisiana Levee District appeals a judgment declaring that a levee servitude under its jurisdiction has been extinguished by abandonment, and granting the owners of the affected land full and unfettered rights of ownership. Finding no legal or factual error, we affirm.

Factual background

The plaintiffs, Gene Laird, James Laird and Dahlia Plantation, sued the Board of Commissioners for a declaration that the plaintiffs own the dirt in a levee that has stood on their (or their ancestors in title’s) property since 1933.[1] Several other landowners intervened, aligning themselves with the original plaintiffs. The matter proceeded to trial in January 1996, at which time testimony and extensive documentary exhibits were introduced. The District Court accurately and concisely summarized the evidence as follows:
This suit arises from a dispute over the existence vel non of a servitude burdening a portion of levee in the Fifth Louisiana Levee District. The plaintiffs are a group of landowners who own property upon which the subject levee, known as the Bayou Vidal-Elk Ridge Ring Levee (“Ring Levee”), is situated. The landowners allege, inter alia, that the levee servitude has been abandoned and that full and unfettered rights of ownership of the man made pile of dirt should revert to the respective owners.
Defendants herein are the Board of Commissioners of the Fifth Louisiana Levee District who submit, inter alia, that prescription of nonuse does not apply to legal servitudes such as the levee servitude, and .that the defendant has neither expressly [nor] tacitly abandoned the levee servitude and thus the servitude continues to burden the subject area.
Prior to the Mississippi River Flood of 1927, the controlling or iront-line levee was known as the lone Levee, Palmyra Lake Levee or Bayou Vidal-Elk Ridge Frontline Levee and had a 1914 grade. Subsequent to the devastating flood of 1927, the Flood Control Act of 1928 was passed and the United States Army Corps of Engineers and the Board of Commissioners of the Fifth Louisiana .Levee District began to obtain rights-of-way to construct another primary levee which would be |2known as the Bayou Vidal-Elk Ridge Setback or Ring Levee. This levee was completed in 1933 to a 1928 recommended grade and is the disputed levee in the instant suit.
The Ring Levee was the controlling levee until sometime in the mid 1950s *406 when the Corps of Engineers and the Board of Commissioners * * * decided to improve the lone Levee to a 1942 grade which would place it as the controlling or frontline levee. The lone Levee has remained the controlling or mainline levee since its improvement in the 1950s.
From the mid 1950s through the present time the Ring Levee has been breached in several locations. Some of the breaches were authorized by the Levee District, some were unauthorized [including one referred to as “the Somerset breach”] and one breach was caused by experimental blasting done by the Corps of Engineers on the property of Gene Laird, one of the plaintiffs.
Believing the levee to be abandoned, Gene Laird entered into a contract with a construction company for the purchase of dirt from that portion of the Ring Levee located on Laird’s property. The Levee Board contacted the construction company and persuaded it to terminate the “dirt contract” with the plaintiff * * * until a resolution of the issues presented in the suit. The “dirt contract” and its suspension or termination precipitated this suit.***
From the evidence admitted this court finds that since the mid 1950s the Ring Levee has not served as the frontline or primary controlling levee for this portion of Tensas Parish. With the exception of the extreme ends of the Ring Levee at its intersection with the primary levee the Ring Levee has not been maintained by the Levee Board or any other governmental entity since it became the secondary levee. Any maintenance on the Ring Levee since the mid 1950s was performed by the respective owners of the property or their agents or lessees. Consequently, the condition of the Ring Levee varies from very good to very poor. Some areas of the levee have been maintained for cattle grazing while some have been allowed to “grow up” in trees, weeds and other native vegetation.
The Ring Levee, which was built to a 1928 recommended grade, is not suitable or functional to control flooding because of its height, its breached condition and the presence of trees and other vegetation with roots compromising the compactness of the soil. As was stated in 1980 by the District Engineers for the Corps of Engineers, the only utility for future flood protection would be as a borrow source for levee enlargement of the mainline or primary levee. Although the evidence demonstrated that the Fifth Louisiana Levee District plans to offer or has offered the Ring Levee dirt to the Corps of Engineers as fulfillment of its legal obligation to provide rights of way for levee construction to be performed by the Corps of Engineers, the evidence also illustrated that the only portion of the Ring Levee dirt that may be economically feasible to use would be that portion situated very near the mainline levee. Although the evidence on this issue was not comprehensive or conclusive, it tended to indicate that due to transportation or hauling expenses, the use of the Ring Levee dirt as Rborrow would be much more expensive than obtaining dirt from existing rights of way or newly acquired rights of way.

Action of the trial court

The court classified the levee servitude as a predial servitude imposed by law,[2] a negative servitude,[3] and a legal public servitude.[4] *407 The court found that the Ring Levee had not, for over 30 years, served the purpose for which it was built. The court cited eases involving disputes between private landowners but stating that a levee servitude could be abandoned. Lieber v. Hamel 446 So.2d 1240 (La.App. 2d Cir.), writ denied 448 So.2d 107 (1983); Caillier v. Profito, 171 La. 693, 131 So. 851 (1931). The court noted that under current law, the renunciation of a predial servitude must be “express and written.” La. C.C. art. 771. The court also noted, however, that art. 771 had been enacted only in 1977, and it represented a change in the law; prior to January 1, 1978, the abandonment or renunciation of a levee servitude could be express or tacit.
The court found the record evidence established tacit abandonment. A 1980 letter from the Corps of Engineers to Board President Samuel P. Collins referred to the Ring Levee as abandoned: “It is anticipated that the only utilization of the abandoned levee, for future flood protection, would be as a borrow source for the current levee enlargement program.” Exhibit P-39. A 1973 minute entry from the Board’s meeting stated that “no objection was offered to the property owners’ request for construction of levee ramp on the abandoned Somerset levee.” UExhibit D-7 (8/8/73). The court recognized that these items were subject to diverse interpretations, but viewed them in light of the important evidence that the Ring Levee is deteriorated in many places and “has not provided flood protection to the citizens of Louisiana for many years.” The court therefore concluded that the Board abandoned its servitude prior to 1978. Alternatively, the court found that the Board had lost its servitude to nonuse.[5] Finally; the court rejected the plaintiffs’ claims for pecuniary losses.
The Board has appealed.

Discussion

By its first assignment the Board urges the District Court erred in finding a tacit abandonment based on “the actual condition of the Ring Levee and that it has not provided flood protection to the citizens of Louisiana for many years.” The argument takes three related positions.
First the Board contends that properly analyzed, the documentary evidence shows that the Ring Levee was never intended to be the front line of protection against flood waters; thus it did not lose its function as a part of the continuous system or series of levees when the lone and Palmyra Levee was raised in 1956. Thus the Ring Levee always was, and still is, “a backstop and borrow for pending levee improvement items.” Br., 10.
Second the Board argues that the court improperly considered the “burden on the plaintiffs” in deciding whether to continue the levee servitude. The Board urges that its control over levees is conferred by the Constitution and statutes, Dickson v. Board of Comm’rs, 210 La. 121, 26 So.2d 474 (1946), and its authority cannot be compromised by the burden on the plaintiffs.
Finally the Board urges this court to apply La. C.C. 771, as amended in 51977, retroactively to hold that any valid renunciation of the levee servitude had to be express and written. The Board suggests that our prior opinion in Lieber v. Hamel, supra, holding that the 1977 amendment to art. 771 is prospective only, should be distinguished on its facts, and that nothing in the correspondence files or the Board’s minutes can be construed as an express renunciation.
The District Court’s findings are reviewed under the manifest error rule. The appellate court will not set aside the District Court’s finding in the absence of manifest error, or unless it is clearly wrong. Stobart v. State, 617 So.2d 880 (La.1993). If the District Court’s assessment of conflicting evidence is reasonable, it will not be disturbed. Id. The manifest error rule extends to findings based on documentary evidence. Virgil v. American Guarantee & Liability Ins. Co., 507 So.2d 825 (La.1987). Any doubt as to the existence, extent, or manner of exercise of a predial servitude must be resolved in favor of the servient estate. La. C.C. art. 730.
*408 We first address the Board’s third issue, the retroactivity of art. 771. Since the amendment in 1977, this article has required the renunciation of any servitude to be “express and written.” In Lieber v. Hamel, supra, this court held that the amendment was substantive and not retroactive. Although the actual controversy in Lieber was between private property owners, we decline to overrule its holding. Revision Comment (a) states that art. 771 “changes the law as it suppresses the rule that the renunciation may be tacit.” A leading commentator also observes that the amendment substantially changed the law. See Yiannopoulos, 4 La. Civil Law Treatise, Predial Servitudes, § 171. In light of the substantive change, we are still obligated to apply the prior law to facts that occurred prior to 1977.
Prior to 1977, servitudes could be extinguished by “the renunciation or voluntary release of them by the owner of the estate to which they are due. This | ^renunciation or release may be express or tacit.” La. C.C. arts. 816, 783(5) (repealed). Tacit renunciation was the erection of works preventing the exercise of the servitude, but with the consent of the owner of the dominant estate. Taylor v. Boulware, 35 La.Ann. 469 (1883); Delahoussaye v. Judice, 13 La.Ann. 587 (1858); Yiannopoulos, Predial Servitudes, supra.
We have applied this law to the instant record. If the owner of a dominant estate may tacitly renounce his servitude by permitting the servient estate to erect works that make it impossible to utilize the servitude, then a fortiori he may tacitly renounce his servitude by himself engaging in conduct that prevents the exercise of the servitude. We believe this is precisely what occurred in the instant case. The Board worked with the Corps of Engineers in planning and participating in the construction of the lone and Palmyra Levee in the 1950s. Shortly after this new, mainline levee was completed, the Ring Levee was breached on the Somerset property and elsewhere. Every witness agreed that since that time, the Ring Levee could not provide any flood protection at all, owing to its inferior elevation and degraded condition.
In light of this conclusion, we have closely considered the Board’s first issue, whether the District Court erred in finding that the Ring Levee ever was a mainline structure. The Board contends that prior to 1956, the Ring Levee was not mainline, only a “backstop,” so nothing really changed thereafter. Admittedly, this large record is somewhat equivocal about the exact status of the Ring Levee from the time of its inception, its completion, to its ultimate degradation. The Board originally proposed building the Ring Levee for fear the river would change course and run through Lake Palmyra; in that event, the lone and Palmyra Levee (built only to 1914 grade) would have been inadequate. Exhibit D-7 (3/6/29). After the 1927 flood damaged that Levee, the Board appropriated land pfor the Ring Levee in 1929 and completed it in either 1931 or 1933. Id. (12/5/29); R.pp. 44-46; Ex. D-l (11/15/49). The Corps, however, took the more aggressive measure of building Diamond Cut-Off to divert the river away from Lake Palmyra. The cutoff was begun in 1933, and according to Mr. Miller, was substantially complete by 1939; the Board states that by 1937, the cutoff “had taken the pressure off of the Palmyra frontline levee.” Br., 3. Nevertheless, the Ring Levee was of sufficient quality to be a mainline levee from the time of its completion in the early 1930s until the mid 1950s. By 1956, the Ring Levee no longer provided this service. The record does not undermine the District Court’s finding that the Ring Levee was the mainline levee until 1956. Stobart v. State, supra. At that time, by failing to prevent or repair breaches, or otherwise assure the integrity of the structure, the Board relinquished the Ring Levee to flood control and tacitly abandoned its servitude.
In brief the Board poses the question, who is to decide the continuance of the servitude, the landowners from their individual perspectives, or the Board, from the standpoint of flood control? Br., 12. Since 1956, the Ring Levee has been useless either as mainline, or for backstop flood protection; it presents only the prospect, or mere possibility, that its dirt might at someday be used to improve the mainline levee. This ambivalent state *409 ment of the levee’s function casts great doubt upon the “manner of use” of the servitude. La. C.C. art. 730. It actually fortifies the conclusion that since 1956, the servitude has been abandoned.
In a supplemental filing with this court, the Board has submitted a federal consent decree regarding the improvement of the mainline levee.[6] This obligates the Corps of Engineers to perform a Supplemental Environmental Impact ^Statement which analyzes, inter alia, “use of conservation easements and other nonstructural alternatives; * * * use of innovative construction techniques; and obtaining construction material for the Project from non-sensitive, non-wetland areas on the land side of the levees.” Consent decree, 6. The Board contends that these requirements enhance the prospect that Ring Levee dirt will be needed for the ongoing mainline levee improvement project. However, these requirements were discussed at trial, R.pp. 167-169, 200, and do not undermine the District Court’s opinion. According to Mr. Miller, the Ring Levee contains five million cubic yards of dirt, of which the mainline levee project requires 3.2 million cubic yards. This lawsuit began when one of the plaintiffs attempted to sell 3,800 cubic yards of Ring Levee dirt, less than 1% of that available. This record does not show that the Ring Levee will likely or probably be needed for mainline repair; and if it eventually is, the record does not show that this source will be unavailable.
For these reasons we find no legal or factual error in the District Court’s finding of abandonment. We pretermit consideration of the Board’s second and third assignments of error, pertaining to nonuse. Once the servitude was abandoned, there was nothing to lose to nonuse.

Conclusion

For the reasons expressed, the judgment of the District Court is affirmed. Costs are not assessed. La.R.S. 13:4521; Board of Com’rs v. Commission on Ethics for Public Employees, 484 So.2d 845 (La.App. 1st Cir.), writ denied 487 So.2d 440 (1986).
AFFIRMED.

. The plaintiffs also sought money damages for intentional interference with the performance of a contract to sell dirt, and for harm to their business reputation. The denial of these items has not been appealed.

. La. C.C. art. 654 provides: “Predial servitudes may be natural, legal, and voluntary or conventional. Natural servitudes arise from the natural situation of estates; legal servitudes are imposed by law; and voluntary or conventional servitudes are established by juridical act, prescription, or destination of the owner.”

. La. C.C. art. 706 provides, in part: "Negative servitudes are those that impose on the owner of the servient estate the duty to abstain from doing something on his estate. Such are the servitudes of prohibition of building and of the use of an estate as a commercial or industrial establishment.”

.La. C.C. art. 665 provides: "Servitudes imposed for the public or common utility, relate to the space which is to be left for the public use by the adjacent proprietors on the shores of navigable rivers, and for the making and repairing of levees, roads and other public or common works. All that relates to this kind of servitude is deter *407 mined by laws or particular regulations.” (Emphasis added.)

. La.C.C. art. 753 provides: "A predial servitude is extinguished by nonuse for ten years."

. Mississippi River Basin Alliance v. Lancaster, No. 96-3208 (E.D.La.), consent decree of June 16, 1997.